[Civ. No. 7327. Second Appellate District, Division Two.—February 28, 1933.]

LELA A. BRUST et al., etc., Appellants, v. C. J. KUBACH COMPANY (a Corporation), Respondent; BAKER IRON WORKS (a Corporation), Intervener and Appellant.

Samuel A. Rosenthal, Gibson, Dunn & Crutcher and Theodore Stensland for Appellants.

George P. Kinkle, John S. Hunt and Richard J. O. Culver for Respondent.

WORKS, P. J.—Plaintiffs bring suit for the recovery of damages for the death of Edward J. Brust, husband and father to them respectively. The decedent was an employee of Baker Iron Works at the time of his death. Upon due application therefor that corporation, under award by the Industrial Accident Commission, was required to render compensation for the death of Brust. It becomes an intervener in this action for the purpose, if plaintiffs shall be successful in the suit, of recovering what it has paid under the award. Defendant had judgment and plaintiffs and the intervener appeal from the judgment and from an order of the trial court denying their motion for a new trial. Throughout this opinion defendant will be referred to as

Kubach Company and intervener will be referred to as Baker Company.

The death of Brust occurred during the construction of the Los Angeles city hall. Kubach Company was the general contractor for the construction of the building. Baker Company was an independent contractor whose duty it was to install the elevators in the structure. For the purpose of raising to appropriate place the materials to be used by it in constructing the building, Kubach Company had erected a temporary tower, or shaft. It was a part of the work of Baker Company, in connection with its work of installing the elevators, to place in the building a motor which was to furnish the power for the purpose of operating them. Kubach Company allowed Baker Company the use of the tower and of its equipment therein for the purpose of lowering this motor to place. The work was done by means of a seven-eighths inch wire cable which was reeved through two blocks. One of these blocks was appropriately fastened near the top of the tower, while the other, with hook attached, traveled up or down the shaft, as the case might have been, with loads which were being raised or lowered. The blocks used at the time which is of interest here were the property of Baker Company, but the tower, the wire cable, and all instrumentalities employed in the lowering of the motor, with the sole exception of the blocks, were the property and under the general control of Kubach Company. Brust, the unfortunate decedent, was engaged about the lowering of the motor for his employer, Baker Company, and that work was completely done at about 4:30 of a certain afternoon. Thus was terminated the specific permission for the use of the tower and equipment which had been extended by Kubach Company to Baker Company. On the next morning Brust and other employees of Baker Company went to the city hall for the purpose of securing the two blocks which belonged to that corporation. Meanwhile employees of Kubach Company had been instructed to ''tear down'' the tower, the work on the building having neared completion, and when Brust arrived at the structure they, as preparatory to their main work, were actually engaged in lowering the steel cable and the blocks through which it was reeved. This lowering was in progress by means of a three-quarters inch manila rope. The building is twenty-

eight floors in height and the men were lowering the cable and blocks from about the top level. When Brust came upon the scene he went to the twenty-fifth floor and proceeded to the platform even with that floor and upon which materials to be used in that vicinity had theretofore been unloaded by Kubach Company. As Brust stood on the platform the manila rope parted, the heavy wire cable fell, a loop formed in it which encircled Brust's neck, and he was strangled to death.

The action was tried by a jury. In addition to a general verdict for Kubach Company the trial body found several special verdicts:

1. Brust was upon the platform of the hoisting tower at the time of the accident.

2. He was on the platform solely in pursuance of the business of Baker Company.

3. "Q. Was the cable which was being lowered . . . caused to fall solely by reason of some defect in the equipment or appliances used by defendant? A. No."

4. "Q. . . . [S]tate what you find to have been the proximate cause of the fall of said cable, and if you are unable to determine the cause, so state. A. Parting of the rope, cause unknown."

The first and practically the only point to be determined is: What was the status of Brust as he stood at what turned out to be a place of imminent danger—at his place on the platform of the tower? Appellants contend that he was an invitee of Kubach Company. That corporation insists that he was a mere trespasser, or, at most, but a licensee. Appellants retort that if he was not an invitee, he was not a trespasser, but was "at least a licensee". The striking parts of the views of appellants upon these questions are contained in the reply brief. Perhaps the questions may best be solved by means of a traverse of some of the statements there made and we shall pursue that labor at some length. The case is a most important one to all concerned. It is argued with vigor on both sides. For these reasons, although the solution of the appeal seems simple to us, we are perhaps required to exhaust much space in determining it. At least, we are justified in taking that course.

Appellants make the following significant statement: "It is not our contention that the Baker Iron Works, under the

facts of this case, was doing any work under any contract therefor, with the respondent. When we mention an agreement between said Baker Iron Works and respondent, we refer, or, at least intend to refer, specifically to that agreement whereby respondent gave said Baker Iron Works permission to use respondent's hoist in the City Hall Building, for the purpose of performing some of the work to be done by said Baker Iron Works under its contract with reference to the construction of said building, said respondent's said hoist being that particular instrumentality which, while under the exclusive control, management and operation of respondent, suffered a break in a part thereof, resulting in the accident in question.''

It is said again, by appellants, ''that the Baker Iron Works had the permission of the respondent's foreman to use the respondent's said hoisting-tower and hoisting instrumentalities on the day before the accident in question, for the purpose of lowering machinery, or something that had to do with an elevator, . . . and to use said hoisting instrumentalities and tower in that connection; that everything in use at the time of this accident, and every appliance, with the exception of the blocks which were not [sic] actually used in this operation, were under the control of the defendant''.

A little further on appellants also say that on the day of the accident to Brust ''the said physical work of actually lowering said elevator machinery having been completed on the preceding day, said decedent, Brust, as foreman in charge of employees of said Baker Iron Works, returned to said City Hall Building for the purpose of removing, from respondent's said hoisting instrumentalities, the said hoisting-blocks belonging to said Baker Iron Works, as aforesaid, but found that he and his men could not have immediate access to said blocks or immediately engage in the physical work of removing them because of the fact that respondent's employees were then operating respondent's hoisting instrumentalities in work of respondent; that, while awaiting an opportunity to reach and remove said hoisting blocks, the said Brust had walked out on to the platform adjacent to said hoisting-tower, at the 25th floor of said City Hall Building, when a part of respondent's said hoisting instrumentalities, then being lowered by respondent's servants, broke

or parted, permitting a steel cable, attached to said hoisting instrumentalities, to fasten itself about the shoulders and neck of said decedent, Brust, thereby causing his death by strangulation.''

Again, it is remarked that ''it conclusively appears that the Baker Iron Works had the express permission of the respondent's foreman to use respondent's said hoisting-tower and respondent's hoisting instrumentalities, connected therewith, . . . for the purpose of lowering certain elevator machinery, then being installed by said Baker Iron Works in pursuance of its contract relative to the construction of said City Hall; that . . . when the employees of said Baker Iron Works (i. e., decedent, Brust, foreman, and his crew), quit work for that day, at 4:30 p. m., the respondent's hoisting instrumentality and the blocks of the Baker Iron Works, thereto attached, were left hanging in said hoisting-tower, said hoisting instrumentality being respondent's only equipment therein; that the upper one of said blocks, with said cable fastened through the same, was then fastened at the top of said hoisting-tower, and that it would take some 15 or 20 minutes to remove said cable from said block, it being necessary to lower said cable for that purpose; that on the following morning . . . at about 9:30 o'clock, when the decedent, Brust, foreman, as aforesaid, for said Baker Iron Works, and his crew of men returned to said hoisting-tower for the purpose of getting their said blocks, the respondent's foreman, Elliott, and other of respondent's employees, were there engaged in lowering said cable (then attached to a concrete bucket) down through said hoisting-tower; that thereupon the employees of said Baker Iron Works, pursuant to instructions from their said foreman, the decedent, Brust, went to the top of said tower to get the Baker Iron Works' block there hanging, as aforesaid, while the decedent, Brust, remained on a staging, adjacent to said tower, at the 25th floor of said building, at which place the respondent's foreman, Elliott, and his men were engaged, lowering said cable; that at the time of the accident in question, resulting from the falling of said cable, pursuant to the breaking of a rope, thereto attached and used by respondent's employees in lowering said cable, the decedent, Brust, continued to be on said 25th floor-staging, whereon said cable fell, said Brust having been there

then for a period from two to three minutes, during which time respondent's said foreman, Elliott, and his crew of men were there engaged in lowering said cable, as aforesaid; that at the time of said accident and for a few minutes prior thereto, the workmen about said tower were, at all times, in position to see and did actually see the decedent, Brust, on said 25th floor-staging.''

Appellants attempt to make much of a stipulation entered into at the trial. Upon this subject they say: ''Respondent, however, appears to forget or designedly disregards its express admission that, at the time of the accident, 'said decedent was merely waiting for respondent's employees to finish using the hoist in order that he and the co-employees of the Baker Iron Works might go upon the hoist and remove the blocks and tackle of the Baker Iron Works'; and, likewise, respondent's express admission that on the morning prior to the time when the accident occurred, to-wit, at about 9:30 or 10:00 o'clock, the decedent, Brust, and other employees of the Baker Iron Works arrived at the City Hall and went to the 25th floor, but found that they could not have access to the blocks, the removal of which was the only work to be done by them, due to the fact that the respondent's employees were doing some work and were using their own (respondent's equipment).'' It is to be observed specially as to this particular matter that even if Brust was ''waiting'', there is absolutely nothing in the evidence, or by stipulation, to the effect that he was privileged so to wait upon the platform adjacent to the 25th floor of the building.

Another quotation from the reply brief of appellants: ''As admitted by the respondent, the decedent, Brust, on the day of the accident and at and immediately prior to the occurrence thereof, was on the premises in question exclusively for the purpose or business of removing said pulley-blocks for his employer, the Baker Iron Works. In other words, he was there with the knowledge and consent of the respondent, in pursuance of his employment by said Baker Iron Works and for the exclusive purpose of doing necessary work for said employer under the latter's contract in the construction of said City Hall building; but, for a minute or two prior to the accident and at the time thereof, he was being deterred from physical action in that behalf

by respondent's servants. Under no stretch of imagination can it then reasonably be said that, at and immediately preceding the occurrence of the accident, he was on said premises merely as an idle spectator, or on a frolic of his own, or out of curiosity, or for his own pleasure or convenience, or wrongfully and without any legitimate business or purpose. The removal of said pulley-blocks from respondent's hoisting apparatus was fully as much within the contemplation of respondent's express permission of the user of said hoisting apparatus, by decedent's employer, as had been the attaching of said blocks to said apparatus, preparatory to said user. And, in both instances, said decedent was there, with the consent and knowledge of the respondent, in the course of his employment and doing work for his employer, the Baker Iron Works, in the performance of the latter's contract relative to the construction of said City Hall building.''

�In It is in this last passage that the fallacious argument of appellants reaches its climax. As shown by the next preceding quotation, the admission of respondent was only that Brust ''was merely waiting for respondent's employees to finish using the hoist'' in order that he and others might remove the blocks of the Baker Company. To admit, even, that he ''was on the premises in question exclusively for the purpose and business of ·removing'' the blocks is very far from stipulating that he was on the *platform of the tower,* rightfully, for any such purpose, or that he was in any place whatever ''with . . . the consent'' of respondent. It is utterly futile to argue that respondent ''consented'' that he should be anywhere for the purpose of removing the blocks while respondent's servants were actually lowering the wire cable, and the evidence shows no such thing. Reduced to its essence the argument of appellants is that because decedent worked the preceding day until the hour of 4:30, under the permission of respondent, he had permission to remove the blocks at any time thereafter, willy-nilly, and no matter what activities in and about. the tower might be engrossing the attention of respondent's servants. Of course, the Baker Company had the right to the possession of its blocks at some time, but its servants could not take them until permission was given by the Kubach Company, or, at least, until the tower

was idle and they might then perhaps be· taken under a permission to be implied under such circumstances. The fact that Brust was ''waiting'' is enough of itself· to show that he had no business on the platform of the tower. If he chose to ''wait'' there he did so at his own risk. The series of quotations we have taken from appellants' reply brief shows, without looking elsewhere, to our minds, that Brust was a mere trespasser while he stood upon the platform and when his life was wrenched away in such a cruel and heartrending manner. There is absolutely nothing in the evidence to indicate that at that unhappy moment he was either an invitee or a licensee. Upon such a conclusion we are bound to affirm the judgment, as the unfortunate wife and children of the trespassing Brust, under authorities too numerous to mention, cannot recover. Under the special findings of the jury—indeed, under the volume of evidence introduced in the case—there is not the slightest gleam of a showing that Kubach Company was guilty of that wantonness or heinousness of behavior toward Brust which alone would entitle appellants to the relief they demand. The rope by means of which the wire cable was being lowered simply broke. That was all.

However, if we unwarrantably go so far as to concede that at the ·moment of his death Brust was a licensee on the platform, the result is the same. That this statement is just is a thing which is demonstrable, again, from appellants' reply brief and from the authorities cited therein. This proposition is stated in the brief, the italics being ours: ''The cases cited by the appellants in support of the proposition to the effect that a mere licensee can recover only for wilful or wanton injury, are all cases where the plaintiff was either a trespasser or a mere licensee, and was injured *solely by reason of the unsafe condition of the premises and without any active, or overt act of, negligence committed against him* by the occupant or owner of the premises.'' To this statement many cases are cited. We give only the California output: *Grundel* v. *Union Iron Works,* 141 Cal. 564 [75 Pac. 184]; *Schmidt* v. *Bauer,* 80 Cal. 565 [22 Pac. 256, 5 L. R. A. 580]; *Herzog* v. *Hemphill,* 7 Cal. App. 116 [93 Pac. 899]; *Means* v. *Southern Cal. Ry. Co.,* 144 Cal. 473 [77 Pac. 1001, 1 Ann. Cas. 206].

Immediately following these and the foreign citations we find this in the brief, the italics again being ours: "The expression found in some of such cases to the very broad effect that no duty is owed to the licensee except not to injure him wilfully or wantonly, was but *obiter*, and has no application to a case where the plaintiff is upon the premises of the defendant, and is injured by an *overt act of negligence* committed against plaintiff by defendant. A licensor does owe the duty to exercise ordinary care to avoid by any *overt act* injuring a licensee upon his premises with his knowledge and consent, and is responsible in damages for any injury resulting to the licensee from his *overt act of negligence*." After citing a long list of cases, the brief writer goes on, with our italics: "After stating the rule to the effect that the landowner *owes no duty to keep his premises safe* toward a mere licensee, the court, in *Pomponio v. New York, H. H. & H. R. R. Co.,* 66 Conn. 528 [50 Am. St. Rep. 124, 32 L. R. A. 530, 34 Atl. 491], said, 'But while this is so, it is also true that the landowner must not himself, by what has been called *"his own active negligence"*, injure either the licensee or the party invited, while they are upon his land. This is a duty to both equally. Toward both, in this respect, he is bound to exercise the same amount of care.' "

We have quoted enough for our purpose. Disregarding what is said in the last excerpt about an invitee, and viewing Brust for the moment as a licensee, it will be observed that appellants certify to us—and they are correct in doing so—that a licensee, or his heirs, as here, can recover damages only for an *overt act of negligence* on the part of the defendant pursued. Appellants even assure us that an owner is not bound "to keep his premises safe toward a mere licensee". How do these matters affect the present case? Here there was no *overt act* or any act of negligence. The rope by means of which the cable was being lowered simply broke, as we have observed. It will be remembered that one of the special verdicts was to the effect that the catastrophe to Brust was caused by "Parting of the rope, cause unknown." There was some evidence as to why the rope parted. One of the employees of Baker Company said it "was frayed" and "we didn't think it was safe"—this "we" not including Brust. Another worker for Baker Com-

pany referred to the thing as "a lime-eaten rope". Another called it a "weak rope", and referred to it as "the rotten rope". On the contrary, it is fair to observe, employees of Kubach Company testified that the rope was in good condition, and one said that it was "new". Also, what was identified as the rope in question was introduced in evidence and exhibited to the jury. But the condition of the rope was entirely immaterial to the case of appellants. If it be granted that it was rotten, the circumstance merely indicates that Kubach Company had failed "to keep its premises safe" as to the licensee. For this reason the jury may be excused for not resolving, one way or the other, the evidence as to the state of the rope, and merely finding that its parting was through some "cause unknown". Perhaps, indeed, the jury found that the rope was "new" and for that reason said that the cause of its parting was unknown. But, as we have said, all this makes for nothing. There was not the slightest showing of any overt act of negligence by the servants of Kubach Company. Upon this score, therefore, appellants were not entitled to recover, even if we go so far as to consider the trespassing Brust as a licensee.

■ Appellants offered many instructions upon the doctrine *res ipsa loquitur,* but the trial judge refused to give them. He was right in doing so. There is nothing here which "speaks for itself" so that appellants may hear. It is said in a standard publication, concerning the rule *res ipsa loquitur,* "that in order for the doctrine to apply it must appear that the injured person was in a place where he had a right to be, and the doctrine cannot be invoked so as to raise a presumption of negligence when the defendant is only under the duty to avoid affirmative or active negligence, such as that owing to a trespasser or to one on his premises by virtue of mere passive acquiescence or a naked license" (45 C. J. 1209). Among other cases, *Powers* v. *Raymond,* 197 Cal. 126 [239 Pac. 1069]; is cited in support of this text, but in the opinion the question is not thoroughly discussed. We think the quoted text states the correct rule. It were strange if it were otherwise.

We see no error in the refusal of the trial judge to give any of the instructions proffered by appellants. The evidence which establishes Brust's status as he stood upon

the platform of the tower is undisputed, and a case is therefore presented in which appellants could not possibly recover.

In civil cases no appeal lies from an order denying a motion for a new trial.

The appeal from the order denying a new trial is dismissed. Judgment affirmed.

Stephens, J., and Archbald, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 28, 1933.