[Civ. No. 9592. First Appellate District, Division One.—October 30, 1936.]

OTTO ANDERSON, Respondent, v. WESTERN PACIFIC RAILROAD CO. (a Corporation) et al., Defendants; PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

Thomas J. Straub, W. H. Spaulding, Clinton F. Stanley and W. R. Dunn for Appellant.

Joseph A. Brown for Respondent.

THE COURT.—This is an action for damages for personal injuries consisting of severe burns which plaintiff sustained when he went on an open public dump to salvage some pieces of scrap iron. He walked across and to the edge of the dump to pick up the iron, and the bank caved off, precipitating him waist deep into a smouldering fire. The accident happened in the Islais Creek Reclamation District in San Francisco. All of the land in the immediate neighborhood had been used as a public dumping ground for many years. The particular block of land on which plaintiff was injured was divided into lots. They were separately owned, but the entire block was unfenced, and there were no markings on the land to identify the boundaries of the several lots. The complaint was filed some ten months after the accident happened, and the defendants named were several lot owners, among them being Western Pacific Railroad Company, Adelheid G. Schultze, C. L. Tilden and Helen D. Umbsen; also Meyer Rosenberg and L. Rosenberg, and the Pacific Gas and Electric Company. The Rosenbergs held contracts with some of the lot owners to fill in their lots, and the Pacific Gas and Electric Company, with many others, had been dumping refuse on the land. Its refuse consisted of lamp-black from one of its gas plants near by. Plaintiff subsequently dismissed the action as to all defendants except the Pacific Gas and Electric Company, the Rosenbergs, and Adelheid G. Schultze, and the jury trying the case rendered a verdict against the Pacific Gas and Electric Company and the Rosenbergs for $25,000, and to its verdict it added: "Exempting Adelheid Schultze defendant." From said judgment the Pacific Gas and Electric Company has taken this appeal.

Appellant contends (a) that plaintiff was guilty of contributory negligence, (b) that one who dumps and abandons refuse to become a part of the realty at a public dump no longer has control of it and is not responsible for injuries to one who goes upon the dump to pick over the refuse, (c) that the plaintiff failed to prove facts showing a duty owed him by appellant to exercise care for his safety in that he failed to prove that the accident happened at a place where appellant did not have the right by invitation to dump and was so clothed with rights as owner for that purpose as not to be obligated to exercise care for the

safety of a trespasser or licensee, (d) that the court erred in the matter of instructions to the jury, and (e) that in any event, the amount of the verdict is so excessive as to show passion and prejudice of the jury in the determination of the issues of fact submitted to it.

The northerly half of the block on which the accident happened contained four lots, and they were owned respectively by Adelheid G. Schultze, Helen D. Umbsen, C. L. Tilden and Western Pacific Railroad Company. Respondent was admittedly a trespasser or at most a licensee on all portions of the' lands within the block; but appellant's status was doubtless that of an invitee on all of said lots with the exception of the Schultze lot, and as to that there is a serious dispute. The action was tried on the theory that the accident happened on the Schultze lot, but there is a great deal of uncertainty as to whether it happened there, or on the Western Pacific's property or on the Umbsen lot, and the exact location of the accident becomes an important factor not only in determining what duty, if any, was imposed on appellant toward respondent, but also in passing upon appellant's assignments of error relating to the instructions. In other words, if the accident occurred on the Western Pacific or the Umbsen properties, respondent could recover from appellant only under the theory of a wilful and wanton injury because appellant was an invitee thereon, and consequently was clothed with all the rights of the owner, so far as the question of negligence was concerned (*Borgnis* v. *California-Oregon Power Co.*, 84 Cal. App. 465 [258 Pac. 394]; *Brust* v. *C. J. Kubach Co.*, 130 Cal. App. 152 [19 Pac. (2d) 845]; *Jacobson* v. *Northwestern Pacific R. R. Co.*, 175 Cal. 468 [166 Pac. 3]; *Leslie* v. *City of Monterey*, 139 Cal. App. 715 [34 Pac. (2d) 837]; *Hamakawa* v. *Crescent Wharf etc. Co.*, 4 Cal. (2d) 499 [50 Pac. (2d) 803]; whereas, if it occurred on the Schultze property and appellant was not an invitee thereon, but was a trespasser, then, respondent being also a trespasser or at most a mere licensee, the doctrine of ordinary negligence would seem to govern. (*Roberts* v. *Pacific Gas & Electric Co.*, 102 Cal. App. 422 [283 Pac. 353].)

With respect to the question of the location of the accident, plaintiff did not know where it occurred, but in the

complaint he alleged that it happened "623 feet west from Third Street and 355 feet north from Army Street", and counsel for plaintiff in his opening statement to the jury stated that his witnesses would establish the exact spot where it occurred. During the taking of the evidence, however, it developed that if the measurements alleged in the complaint were correct the accident happened on the Western Pacific's property or on the Umbsen property, and not on the Schultze lot. Thereupon respondent sought to prove the location by his brother, Ivar Anderson, who was with him at the time of the accident and who shortly afterwards took the measurements upon which the allegations of the complaint were based; but as will be seen from the following his testimony was most indefinite. Calling his attention to a large map of the block of land in question which defined the boundaries and specified the ownerships of the several lots, counsel proceeded with the examination as follows: "Q. Can you point out the place on this exhibit No. 4, where it happened, as near as you can? A. Well, I couldn't —point out the exact spot? Q. Yes. A. That is kind of hard to say just the exact spot. Q. No, the approximate place as near as you can mark it with an 'X'. Mark it as near as you can remember. You marked it with a stake, did you? A. I did mark it with a stake. Q. You were back there a good many times afterwards? A. Yes, I was. Q. Mark it as near as you can remember, as closely as you can, as to the place where your brother caved in. A. Well, it isn't clear— Q. You understand this is Army Street (indicating), this is Indiana (indicating), and this is Minnesota (indicating), and this is Twenty-sixth (indicating). A. Well, I couldn't tell you just the exact spot— Q. Mark, please, as near as you can remember where it happened, within ten or fifteen feet; your very best knowledge and recollection of the place. A. As near as I can remember— . . . Q. Was it in this block? A. In this block. Q. Then mark the place. The Court: Just a second. Mr. Brown [counsel for plaintiff]: He says it was in the area on that block. A. In this area. Q. Mark it. A. I walked over it many times. Q. And point to the place as near as you can remember it, Mr. Anderson. A. As near as I can remember it, it would be somewheres in here. (The witness indicating.) Q. Mark it then with an 'X'. (The witness

marks.) . . . Q. Is that 'X' in the place where it happened? A. Approximately.'' The cross so placed on the map by the witness would fix the place of the accident at a point between twenty and twenty-five feet within the Schultze property line, northwesterly of the corner of the railroad's lot; and in explanation of the measurements set forth in the complaint he stated his measurements were correct but that they had been wrongly inserted in the complaint. Counsel for respondent then moved for and was granted permission to amend the complaint to conform to the proof; but in so amending no attempt was made to correct the measurements in the original complaint, nor even to fix the place of the accident on any particular lot. On the contrary the effect of the amendment was that it happened somewhere within the north half of the block, which, of course, included not only the Schultze property but also the lots owned by Umbsen, Tilden, and the Western Pacific Railroad Company.

However, regardless of the question of the place of the accident and the merits of the other grounds urged for reversal, and even assuming that under the circumstances it may be reasonably inferred from all the evidence that appellant was guilty of some negligent act in dumping its refuse on said block, we are convinced that as appellant contends, the evidence establishes as a matter of law that in view of the dangers which were there clearly apparent, respondent was guilty of contributory negligence in deliberately walking over the black smoky surface to the edge of the dump.

As stated, the land within the block had been used as an open dump for many years, and the debris was smouldering most of the time and emitting more or less smoke, especially around the edges. Respondent was not unfamiliar with the general condition in and around the dump because he formerly worked in that neighborhood and rode past the block two or three times a week. On the day in question he and his brother visited the dump shortly after the noon hour for the purpose of salvaging some pieces of scrap iron, and respondent observing some iron near the edge of the dump left the regular pathway followed by pedestrians in cutting across the block, and walked directly out across the dump to the edge to get the pieces of iron. There was a deep hole at the edge of the dump and the uncontradicted evi-

dence proves that around the edge of the hole where respondent proceeded to walk there was a strip eight or ten feet wide and extending along the edge of the hole for a distance of twenty-five or thirty feet, which was black, smoky and smouldering, and with no dirt covering. When respondent reached the edge, the bank caved off and he slid down the side into a smouldering fire below. His brother, who was just behind him, went to his assistance but respondent was badly burned before he could be extricated.

In describing the dangerous appearance of the surface of this black strip near the hole, respondent's brother testified as follows: "Q. What was the general character of the surface of the earth ten or twelve feet away from this hole? A. It was black and part white—grayish white. Q. Was it burning? A. Yes. Q. You could see that, could you? A. Yes, smouldering—smoke." Furthermore, a witness for the respondent named Hovde, who was a short distance away when respondent slid into the hole and helped to remove him therefrom, in describing the same dangerous appearance of the ground near the hole, testified: "Q. Let me ask you one question: Was there dirt piled over this stuff where the hole was and where you went down on the side? A. A little ways away from there it was rocks put on top. Q. Where he received his injuries, where he fell down on the side, there was no dirt on top of it? A. No, just black stuff. . . . Q. . . . While you were there did you see it smoking after the accident? A. Absolutely. Q. What color was the smoke? A. Well, there was plenty. . . . Q. How large a space was smoking there, where Anderson fell over the side? A. That is hard to judge. Q. What is that? A. Twenty or thirty feet, something like that, maybe less and maybe more. . . . Q. And that was along the edge of the dump which was smoking? A. Yes, sir." And another of respondent's witnesses named Arsted, who arrived immediately after the accident, testified: "Q. When was it that you walked across this material, this black material? A. The very same day that accident happened, because I went down to take a look at it. Q. It was at that time that you say you were afraid of falling down? A. Well, absolutely. Q. Why? A. I wouldn't go to the edge, because it was smoking that stuff; it was hot." Moreover, respondent himself admitted that he saw the "black stuff" before he went

upon it. The following is his testimony in this regard: "Q. What was the color of the stuff on top, if you know? A. Black. Q. Black on top? A. Yes. Q. You are sure there was no dirt over it? A. No, no dirt over it. . . . Q. How far did you walk on the black stuff before the accident happened? A. Well, I cannot say exactly. Q. Well, approximately? A. Oh, maybe eight or ten feet. Q. And it was not until you got to the edge of the dump until it gave away with you? A. Yes, sir." True, respondent on redirect examination testified to the effect that he did not see anything from which he could tell there was any fire below the ground, but nowhere did he deny that he did not see, as his witnesses stated they plainly saw, the smoke which was coming from this strip of "black stuff" over which he proceeded to walk to reach the edge of the hole. Respondent admitted that his eyesight was normal; and in this connection the law presumes that a person possessing normal faculties of sight and hearing must have seen and heard that which was within the range of his sight and hearing. (*Young* v. *Southern Pacific Co.*, 189 Cal. 746 [210 Pac. 259]; *Billig* v. *Southern Pacific Co.*, 192 Cal. 357 [219 Pac. 992].) Furthermore, it is a well-settled rule that one who places himself in the way of an obvious and well-understood peril is guilty of contributory negligence which bars recovery of damages for injuries resulting therefrom (*Andrews* v. *Valley Ice Co.*, 167 Cal. 11 [138 Pac. 699]); and it has been held in several other jurisdictions that where one goes upon a public dump for purposes of his own, he assumes the risk of injury (*Butz* v. *Cavanaugh*, 137 Mo. 503 [38 S. W. 1104, 59 Am. St. Rep. 504], citing numerous cases). Therefore, since it appears that the evidence produced by respondent as well as his own testimony shows that he failed to exercise ordinary care for his own safety, and that his negligence in that regard constituted the proximate cause of his injuries, he is not entitled to recover damages therefor.

There is some contention made by respondent to the effect that the place where he was injured was not an open public dumping ground; but the uncontradicted evidence proves that it was and respondent so admitted at the trial. With respect thereto the record discloses the following: "Q. [counsel for appellant in examining re-

spondent] : Now, you knew this place where you were walking and where the accident took place was a public dumping ground, didn't you? A. Yes. Q. And you knew that how? How did you know that? A. Everything was dumped in there. Q. And you saw a dump sign there, didn't you? A. Well, that is some time back I have seen that, but not at the present time I did not see no dump sign. Q. You did not see any dump sign at the time? A. I cannot remember whether I did or not. Q. Well now, reading from the same statement [a. deposition theretofore given by respondent]— . . . 'Q. But you knew it was a public dump ground? A. I assume it was, it said "Dump Open".' Mr. Brown [counsel for respondent] : We will admit that, we went all through that yesterday.''

The complaint alleges in substance and respondent contends that the situation there existing constituted a dangerous trap; but there was no evidence introduced from which any such conclusion may be drawn. On the contrary, the evidence without conflict proves that there was no concealment or trap whatever. The black substance over which respondent proceeded to walk was in plain sight, and he admits having seen it before he started across it. Farther back where the pathway ran across the block the refuse was more or less covered with dirt; but all of the witnesses, including plaintiff himself, testified that the strip of black substance over which he walked to reach the edge of the hole had no covering whatever over it. Moreover, there is no claim made that respondent fell through any crusted surface, respondent in this regard having admitted that he walked clear across the black substance to the edge of the hole, and that when he reached that point the bank caved in, causing him to slip down over the edge into the smouldering fire.

The judgment as to appellant is reversed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 28, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1936.