[Civ. No. 13391. First Dist., Div. One. Oct. 10, 1947.]

WILLIAM BIONDINI, Appellant, v. AMSHIP CORPORA-
TION (a Corporation) et al., Respondents.

John T. Taheny and Terence J. Boyle for Appellant.

Johnson, Ricksen & Johnson, Stanley C. Smallwood and Brown, Rosson & Berry for Respondents.

PETERS, P. J.—Plaintiff brought this action against the several defendants for damages for personal injuries received by him when he fell from a scaffold attached to a ship. At the close of plaintiff's case all defendants moved for a nonsuit on the grounds that the evidence failed to show that defendants breached any duty of care owed to plaintiff, and failed to show that, so far as plaintiff was concerned, any of the defendants were negligent. The motions were granted and judgment entered. Plaintiff appeals.

■ The rules applicable to the power of the trial court to grant a nonsuit are too well settled to require extended discussion. They were succinctly stated in the frequently cited case of *Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768], as follows: "A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' . . . Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury." This court has recently reiterated these rules in a case involving an appeal from a judgment notwithstanding the verdict. (*Docherty* v. *Key System,* 80 Cal.App.2d 890 [184 P.2d 33].) Tested by these standards it is quite apparent that the trial court abused its powers in granting the nonsuit in the instant case.

The following are the relationships of the various parties: The defendant Amship Corporation operated a shipyard. At all times here relevant it had a contract to repair the U.S.S. "Aloith," it being the general contractor. It entered into a subcontract with defendant Harbor Ship Service Company, under which the latter agreed to perform the task of removing the debris from the vessel. Harbor Ship, in turn, subcontracted to a drayman, Fletcher by name, the job of carrying away the debris. Under this last subcontract Fletcher was required to furnish a truck and driver. Plaintiff, William Biondini, was the driver of the truck furnished by Fletcher. While removing debris from the ship to the truck, the scaffold upon which plaintiff was standing collapsed and plaintiff was hurt. The scaffold was built by Amship, and defendant Ames was the leaderman of the Amship crew that constructed the scaffold. Defendant Carlson was the Amship safety inspector.

The plaintiff contends that there is evidence from which the jury could have found that he was impliedly invited by

Amship to use the scaffold; that there is evidence from which the jury could have found that Amship had actual knowledge that the scaffold was being used in unloading the debris; that the evidence shows that Harbor Ship directed plaintiff to use the scaffold in the unloading process and thus adopted it as its own appliance; that there is evidence from which the jury could have found that under the circumstances Harbor Ship impliedly assumed joint responsibility with Amship for the safety of the scaffold, and impliedly represented to plaintiff that it was a safe appliance to use; that there is ample evidence from which the jury could have found that Amship and its defendant employees, and Harbor Ship, were negligent. In addition, plaintiff asserts that the doctrine of res ipsa loquitur applies as against both Amship and Harbor Ship and that for that reason alone the judgment of nonsuit must be reversed. Defendant Amship and its defendant employees maintain that plaintiff, as to it, was a mere licensee in using the scaffold; that it extended no express or implied invitation to plaintiff to use the scaffold; that there is no evidence of any act of negligence on its part; that there is no basis for the application of the doctrine of res ipsa loquitur as to it. Defendant Harbor Ship maintains that under the evidence it owed plaintiff no duty with respect to the scaffold, and that it had no right of management or control over it and cannot be held responsible for its collapse. It also contends that it was not negligent and that the doctrine of res ipsa loquitur is not applicable.

As before noted, Amship, as general contractor, contracted with Harbor Ship for the latter to remove the debris from the ship and to dispose of it. Harbor Ship, in turn, subcontracted with Fletcher, who was required to furnish a truck and driver for these purposes. Plaintiff was employed by Fletcher as driver, and started work on this job early in January, 1945. Plaintiff testified that Fletcher told him to report with his truck to the supervisor of Harbor Ship at the dock, Barrera by name, for his working orders. Barrera told plaintiff that the rubbish and debris on the ship had to be removed, and that Harbor Ship employees on the ship would assist him in removing the debris from the ship, and in loading the truck. When plaintiff first reported to Barrera there was a long scaffold attached to the ship some few feet below the level of the deck, which scaffold extended practically the

entire length of the vessel on the dock side. There was a lot of equipment piled along the dock and Barrera warned plaintiff that, in throwing the debris from the deck to the truck, he should be careful not to hit this equipment; that shortly thereafter one of the Harbor Ship employees started to throw some heavy boxes from the deck into the truck, and one of the boxes fell off and hit some of the piled equipment; that Barrera then told plaintiff to use the scaffold with the "heavy stuff"; that the "heavy stuff" should first be relayed from the deck to the scaffold and from there to the truck. Thereafter, and on frequent occasions, plaintiff and the Harbor Ship employees used the scaffold for this purpose. On many occasions plaintiff would stand on the scaffold and various Harbor Ship employees would hand him down sacks of broken concrete, and plaintiff would then drop them into his truck. These sacks weighed 75 to 100 pounds. At this time, and at all times here involved, there was a ladder, without rails, leading from the dock to the deck and a gangplank, but at no time was either used to remove the debris. This was at least partially due to the fact that most of the time the equipment piled on the dock prevented the truck from being parked close to them, and also due to the fact that the accepted, easiest and quickest method of removing the debris was to throw it over the side into the truck.

These activities continued for about three weeks, during which time the long scaffold was frequently used as described. Amship then caused the long scaffold to be removed, and Amship employees replaced it with a short one. It was from this short scaffold that the plaintiff fell. It was about 6 feet in length, and the flooring consisted of three 2″ x 12″ planks nailed to 4″ x 4″ crosspieces. There was a guardrail attached to this scaffold.

Plaintiff testified that before the day of the accident he had never used the small scaffold. At one time he testified that, prior to the accident, he had never observed anyone on the scaffold, while at another time he testified that he had observed some welders using it. There is ample testimony that both Amship and Harbor Ship employees used the scaffold, and there is some testimony that Harbor Ship employees used it in removing debris from the deck.

On the day of the accident—February 7, 1945—plaintiff testified that he backed his truck directly under the center of the short scaffold and then proceeded to the deck of the

vessel. On that day the debris to be removed consisted of sacks of broken concrete. Plaintiff testified that he enlisted the aid of several Harbor Ship employees to assist in loading the truck, and then slid down to the floor of the scaffold on one of the cables by which the scaffold was suspended. It was his intent to stand on the scaffold, to have the men hand him down the sacks, and then he intended to drop them into the dump truck. He testified that he was standing in the center of the scaffold on the middle board when the flooring gave way and he fell. He fell between the dock and the ship, and was seriously injured. He testified that he had not yet received any of the sacks from the men above when he fell. From other testimony it is quite clear that the center plank broke in half, jaggedly, at about the middle of that plank. It is of some significance that, although the safety engineer of Amship was present immediately after the accident, neither he nor any other employee of Amship or of Harbor Ship made any attempt to examine the broken plank to discover the cause of the break, it appearing from the evidence that such broken plank disappeared shortly after the accident and that none of the witnesses knew what had happened to it.

Plaintiff admitted that no one from Amship had told him that he should or could use either the long or short scaffold, and that he had not been told by Harbor Ship employees to use the short scaffold.

Defendant Lester Ames was a leaderman employed by Amship and in charge of the construction and maintenance of all scaffolds on the ''Aloith.'' He had an office on the dock about 30 feet from the ship, from which the long and short scaffolds were visible. His crew constructed both scaffolds. He testified that at his orders the long scaffold had been removed and the short one constructed about a week before the accident. The lumber for all scaffolds was procured from the lumberyard operated by Amship. When a scaffold was dismantled the ''good'' lumber that was salvaged was put in one pile and the ''unfit'' lumber in a scrap pile. In constructing a scaffold the crew would use the ''used'' timbers from the ''good'' pile. He testified that the day after the short scaffold was constructed he visually inspected it by looking down on it from the deck; that he did not get on it; that he paid no attention to the run of the grain in the

2″ x 12″ flooring; that cross-grained timbers should not be used in a scaffold; that the plank flooring was nailed into crosspieces with 16-penny nails; that after the accident he observed that the middle plank of the scaffold was missing; that he made no search for the missing plank, and does not know what happened to it; that his crew was subject to a standard order to examine all planks about to be used in scaffold construction; that he was familiar with dry rot; that the only way he knew to detect dry rot was to "sound" the planks with a hammer; that he did not "sound" any of the planks in the small scaffold nor did he know whether any of his crew had done so.

Clarence Chizer, a leaderman for Harbor Ship, in charge of a gang that was cleaning up the debris on the ship, testified that his crew frequently used the large scaffold in helping plaintiff to load his truck, and that he had observed both Amship and other Harbor Ship employees using the scaffold; that about three days before the accident his crew used the short scaffold in loading heavy material into the truck.

George Blackman was in one of the gangs employed by Harbor Ship to clean up the debris. He saw the plaintiff get on the scaffold just before the middle plank broke. The witness testified that he and the others with whom he worked had used the small scaffold several days before the accident in loading concrete into plaintiff's truck; that he had observed other employees on the short scaffold and that he, his crew, and others had frequently used the long scaffold in the removal of heavy rubbish; that he had never used any other method in removing the heavy rubbish.

Defendant Sutton W. Carlson testified that he was the safety inspector for Amship for two months prior to and at the time of the accident; that he knew Harbor Ship had a crew on the "Aloith" removing the debris, and knew that plaintiff had a truck there for that purpose; that it was his duty to inspect all scaffolds and to order defects, if any, remedied; that he inspected the short scaffold daily by looking at it from the deck; that he did not go down on the scaffold; that he does not know whether the floor planks were new or used lumber; that he made no inspection of the wood in the small scaffold to determine its quality or soundness; that he paid no special attention to the grain of the wood in the flooring; that he did not know of any tests for ascertaining the particular soundness of a plank; that he arrived at

the scene of the accident before plaintiff was removed from the dock; that a little later he noted one plank was missing from the scaffold; that he made no effort to find the missing plank; that prior to the accident he had observed debris being thrown from the deck of the ship, but had not observed anyone on the scaffold for that purpose; that the small scaffold was built for the benefit of welders, pipefitters and painters.

*Should the issue as to whether or not plaintiff in using the scaffold was an invitee of Amship have been submitted to the jury?*

▊ It is the theory of plaintiff that he used the scaffold for the mutual and common benefit of all the parties; that it was a practical necessity to use the scaffold in removing the debris; that such use was the usual and customary method of doing the work; that no notice was given not to use the scaffold; that under the evidence Amship had constructive knowledge of its use; that under the evidence the jury could have implied an invitation by Amship to plaintiff to use the scaffold; that this issue should have been submitted to the jury. Defendant Amship argues that admittedly there was no express invitation on its part to plaintiff to use either the long or the short scaffold; that there was no practical necessity for using the scaffold to relay the debris from the deck to the truck; that the vessel was equipped with a ladder and a gangplank and a crane; that, as a matter of law, under the evidence, plaintiff was, as to Amship, at most, a licensee and not an invitee.

It is our opinion that, under the evidence, the question as to whether plaintiff was an invitee or licensee of Amship should have been submitted to the jury. In our opinion, there was substantial evidence and reasonable inferences from that evidence that would support a finding that Amship knew of the use of the scaffold by plaintiff and Harbor Ship employees, knew that the use of the scaffold in relaying the heavy debris from the deck to the truck was the usual and customary method of performing that operation, and knew that it was the only practical and economical method of performing that job. This being so, the jury could have found that plaintiff was using the scaffold for the mutual benefit of all parties, and was impliedly invited by Amship to use it for that purpose. The existence of the ladder and gangplank which could have

been used by plaintiff and the Harbor Ship employees in removing the heavy debris, although facts that could be considered by the jury on this issue, certainly do not compel the conclusion that the use of the scaffold was not a practical necessity. It is a reasonable interpretation of the evidence that neither the ladder nor the gangplank had ever been used for that purpose, and that neither could be practically used for such purpose. The ladder had no rail. To carry down heavy sacks of debris on such a ladder would have been dangerous and impractical. There is evidence that the foot of the gangplank was constantly cluttered up with materials and equipment so that that means of egress would have been difficult, slow and impractical. It reasonably can be inferred from the evidence that the crane was never used except in unusual circumstances to remove the debris.

There is no doubt that with respect to the ship at large, plaintiff, as an employee of a subcontractor, was a business visitor and invitee of the general contractor, Amship. (*Dingman* v. *A. F. Mattock Co.*, 15 Cal.2d 622 [104 P.2d 26] ; *Hill* v. *Eaton & Smith*, 65 Cal.App.2d 11 [149 P.2d 762] ; *Leenders* v. *California Hawaiian etc. Corp.*, 59 Cal.App.2d 752 [139 P.2d 987].) Of course, the fact that plaintiff was an invitee of this defendant as to the use of the deck is not determinative of the question as to whether he was impliedly invited to use the scaffold. ■ A person may be an invitee as to one portion of the premises and a mere licensee or even a trespasser as to others, but the question as to the extent of the invitation is usually one for the jury and not for the court. ■ The true rule is stated in *Gastine* v. *Ewing*, 65 Cal.App. 2d 131, at page 140 [150 P.2d 266], as follows: "It is true . . . that one may be an invitee to a certain portion of the premises and a licensee or trespasser as to other portions. . . . The question as to whether the invitation, express or implied, included that part of the premises where the injury occurred is generally not one of law. On the contrary, it is usually a question of fact for the determination of the court or jury. [Citing cases.] The invitation of a proprietor extends not only to all parts of the premises which the patron expressly is invited to use, but also to such parts as he or she is impliedly invited to enter, and the invitation also extends to those portions of the premises where the invitee, under circumstances and conditions of his invitation, would naturally be likely to go."

There are several other cases that indicate that under cir-

cumstances substantially similar to those here existing it is a question of fact and not one of law as to whether the injured party in using the particular facility involved was an invitee or licensee. One such case is *Buckingham* v. *San Joaquin Cotton Oil Co.*, 128 Cal.App. 94 [16 P.2d 807]. There the plaintiff was a truck driver employed by one who had a contract with defendant gin operator to convey cottonseed to defendant's mill and unload it there. Plaintiff dumped his seed upon a certain conveyor belt, and, when the machine clogged, he stood on top of the cottonseed and pushed the seed along with his feet. That was the usual and customary method used by all truckmen in such a situation. Due to a defect in the machine one of plaintiff's feet slipped through and was amputated. A judgment against the operator of the mill was affirmed. At page 98 the court stated: "An invitation to use the premises of another is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using them."

In applying this rule to the facts of the case the court stated (p. 99):

"In the instant case respondent was on the premises of appellant engaging in work for the mutual benefit of it and himself. There is substantial evidence that in order to accomplish this work it was necessary for respondent to get on top of the conveyor for the purpose of removing the obstructions that prevented the cottonseed from being carried to appellant's mill. This was the usual and customary method used by all of the truckmen in unloading the seed into the conveyor. Respondent had received no notice from appellant that such use of the conveyor was not permitted.

"While there was no express invitation upon the part of appellant permitting respondent to so use the conveyor, we are of the opinion that under these circumstances there was an implied invitation to use the conveyor for the aforesaid purposes." (See, also, *Bush* v. *Weed Lumber Co.*, 63 Cal.App. 426 [218 P. 618].)

Another case worthy of mention is *Dobbie* v. *Pacific Gas & Electric Co.*, 95 Cal.App. 781 [273 P. 630]. There the plaintiff was an employee for an independent contractor who had contracted with defendant to do some work on defendant's premises. In going to a portion of the premises where some of the work was to be performed plaintiff fell through a sky-

light. If plaintiff was a mere licensee of defendant he could not, under the facts, recover. Defendant claimed that, with respect to the portion of the premises in which the skylight was located, plaintiff, as a matter of law, was, as to defendant, a licensee. The appellate court, in affirming a judgment for the plaintiff, held that the question as to whether or not the invitation included that portion of the premises was one for the jury, and that the facts supported the implied finding that he was an invitee.

Under the rule of these cases it would seem quite clear that whether or not plaintiff was an invitee of Amship in using the scaffold was a question of fact for the jury, and that it was prejudicial error for the trial court to have taken that issue from them.

*Should the issue as to whether or not plaintiff in using the scaffold was an invitee of Harbor Ship have been submitted to the jury?*

■ Plaintiff urges that, although the long and short scaffolds were built and owned by Amship, under the evidence it was for the jury to determine whether Harbor Ship impliedly adopted the scaffolds as its own, whether it impliedly assumed responsibility for their maintenance and safety, and whether this defendant invited plaintiff to use the short scaffold. This defendant urges that it never invited plaintiff to use the short scaffold, that it had no right of control over it, and that under such circumstances it owed plaintiff no duty of care to ascertain whether the short scaffold was safe to use. These contentions are unsound.

It is an admitted fact that the supervisor for Harbor Ship expressly instructed plaintiff to use the long scaffold in removing the heavy debris from the vessel. After the long scaffold was removed and the short one substituted for it, no one told plaintiff that the short scaffold could not be so used. Moreover, there is evidence that prior to the accident Harbor Ship employees frequently used the short scaffold in removing the debris from the vessel. Inasmuch as there is no evidence that Harbor Ship ever objected to such use, since plaintiff had been instructed to use the long scaffold and had not been instructed not to use the short one, and, inasmuch as it is a reasonable inference that the supervisor of Harbor Ship knew or should have known that Harbor Ship employees were using the short scaffold in removing the debris, it would seem quite clear that it was a jury question as to whether, under the

circumstances, Harbor Ship did or did not invite plaintiff to use the short scaffold.

But, says Harbor Ship, even if we invited plaintiff to use the scaffold, we were under no duty to see that it was safe and had no legal right to repair it inasmuch as Harbor Ship did not erect it, did not own it, and did not control it. Those factors, while important, are not conclusive. A company may expressly or impliedly adopt an appliance of another company, and invite others to use it, and, if they do, the company owes to such invitees a duty to exercise reasonable care to see to it that such appliance is safe.

The proper rule was illustrated in *Dawson* v. *Pacific Electric Ry. Co.*, 177 Cal. 268 [170 P.603]. In that case defendant was employed to unload a vessel and employed plaintiff to assist in that job. In unloading the vessel defendant used certain rope slings, some owned by it and some by the owner of the vessel. One of the slings owned by the owner collapsed and plaintiff was injured. At page 271 the court stated: "Much is made of the fact that the sling in question belonged to the owners of the ship, and that in the course of the work the slings were used as they came from the hold without any further inspection. But the evidence shows that the defendant had a number of slings of its own, and that these were used interchangeably with the slings belonging to the vessel. It appears that neither defendant's foreman, nor any other of its servants, made any inspection of the slings belonging to the ship. While the foreman testified, in general terms, that he had examined the slings, his further examination developed the fact that his inspection had been limited to the slings of the appellant. If the defendant saw fit, for its own convenience, to use the ship's slings in connection with its own, it was certainly open to the jury to find that the obligation of due care required it to make some inspection of the ropes furnished by the vessel, before employing them in its work."

Another interesting case on the same general subject is *Perry* v. *D. J. & T. Sullivan, Inc.*, 219 Cal. 384 [26 P.2d 485]. In that case a general contractor was performing work on a building, and subcontracted certain roof work to another contractor. The general contractor erected a ladder to the roof of the building, and, during the course of the work, this ladder was loosened at the top by the subcontractor. The foreman of the general contractor was injured. In affirming a judgment for the plaintiff the court stated (p. 388):

"Appellants first argue that respondent Perry in nailing the ladder to the roof, which the Sullivan Company was under contract to lower, must be deemed as to said company to be a mere licensee to whom said appellants owed no duty other than to refrain from wilful and wanton injury. This is not the true rule. There is no dispute as to the status of the employers of the respondent and the appellant Smith respectively while on the premises of the owner. Each was there under contract to perform separate and distinct work on the building, independent of each other. As to the owner, they were each invitees, and as to each other they were strangers between whom there was no privity of contract. As such contractors, they owed to the employees of each other the same duty of exercising ordinary care for their safety during the progress of the work as they owed to the public generally. [Citing authorities.] The duty of care in the instant case was not only to refrain from the infliction of wilful or wanton injury, but to exercise ordinary care for the safety of the employees of the other contractor on the building.

"Appellants claim that the responsibility for the safe condition of the ladder was the responsibility of the respondents and not the responsibility of the appellants, and insist that inasmuch as there was no duty on the part of the appellants to keep the ladder in a safe condition, they should not be held liable for any injury resulting from the fact that the ladder was not in a safe condition. . . . It is true that if none of the employees of the Sullivan Company had interfered in any manner with the ladder, no responsibility for any injury occurring as a result of the dangerous condition of the ladder could be placed upon the Sullivan Company or their employees for the reason that there was no obligation upon them to keep the ladder in a safe condition. But that is not the situation here. Smith, foreman for the Sullivan Company, did interfere with the ladder and voluntarily assumed control of it, and having done so, he thereby undertook the duty of using ordinary care to see that it continued to be safe for the use of others engaged in work on the building, whose duties required them to make use of the ladder. We do not wish to state that by the voluntary assumption of control over the ladder by Smith, he thereby became an insurer of the safety of anyone thereafter using the ladder. We do state, however, that by such voluntary assumption of control over the ladder he did incur the duty of using ordinary care to the end that

no injury should occur as a result of a dangerous condition of the ladder. 'The true rule of liability on the part of a voluntary undertaker should be this, that he be required to exercise that degree of care and caution which would seem reasonable and proper from the character of the thing undertaken.' ''

Of course, these two cases, one involving an employee's rights against his own employer, and the other an interference by the subcontractor with an appliance constructed by the general contractor, are factually distinguishable from the instant case, but, in spite of such factual distinctions, they establish the rule that even though appliances are owned or controlled by another, there may be a voluntary assumption of use by one who is a nonowner, and that in such event the nonowner owes a duty of due care to those who use the appliance at the nonowner's invitation. None of the cases cited by Harbor Ship establishes a contrary rule. In *Hill* v. *Eaton & Smith*, 65 Cal.App.2d 11 [149 P.2d 762], the appellate court, in holding that under the facts there existing a general contractor owed no duty of care to an employee of a subcontractor who fell through an open skylight, pointed out that there the skylight was an obvious danger that should have been anticipated by the plaintiff, and seemingly held that the injury was the result of the plaintiff failing to protect himself. In *Scott* v. *Fuller Co.*, 41 Cal.App.2d 501 [107 P.2d 55], the injured man used an appliance that he was not expressly or impliedly invited to use, and was injured. Obviously, such employee was not entitled to recover. In *George* v. *Trinity Church*, 176 Cal. 553 [169 P. 69], the general contractor built a scaffold for a subcontractor to be used by the subcontractor. The scaffold collapsed and an employee of the subcontractor was injured. He sued the owner and general contractor. The opinion states that it was the duty of the subcontractor to maintain the scaffold after its erection, and the evidence shows that the scaffold was sound and safe when erected. Under such circumstances it would seem quite clear that the general contractor had no responsibility for the maintenance of the scaffold, and the court so held.

It is our opinion that whether or not Harbor Ship impliedly invited plaintiff to use the short scaffold, whether it assumed responsibility for its maintenance and safety, and whether it adopted the scaffold as its own, were questions of fact that should have been left to the jury.

*Was there any evidence of negligence on the part of either Amship or Harbor Ship in failing to maintain the scaffold in a safe condition?*

█ Of course, whether a particular act or omission constitutes negligence is ordinarily a jury question, and it is only when reasonable minds cannot differ with respect to whether proved facts and reasonable inferences therefrom make out negligence or nonnegligence, that such issues may properly be taken from the jury. As was said in *Davidson Steamship Co.* v. *United States,* 205 U.S. 187, 192 [27 S.Ct. 480, 51 L.Ed. 764], quoting from *Richmond & Danville Railroad Co.* v. *Powers,* 149 U.S. 43, 45 [13 S.Ct. 748, 37 L.Ed. 642] : " '. . . where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this, whether the uncertainty arises from a conflict in the testimony, or because the facts being undisputed, fair-minded men will honestly draw different conclusions from them.' "

█ If plaintiff was a bare licensee, then the defendants merely owed him a duty to refrain from inflicting wilful injury upon him. There is no evidence of any such wilful injury. █ But if plaintiff was an invitee of either or both defendants then the invitor or invitors owed him a duty to exercise ordinary care to provide a safe scaffold. █ There is ample evidence from which the jury could infer that if either defendant owed a duty of due care to plaintiff such defendant violated that duty. Carlson was employed by Amship to check upon the safety of all the scaffolds constructed by Amship. By his own testimony he failed to make a careful check of the safety of the short scaffold. He simply visually inspected it from the deck of the "Aloith." It was a question for the jury whether such cursory inspection satisfied the duty to exercise due care. The plank was obviously defective because it broke in half with the weight of one man. It is quite significant, and the jury would be entitled to consider this fact on this issue, that the broken plank was not produced, and Carlson made no attempt to find it or to examine it to find out what caused it to break.

█ If the jury should find that Harbor Ship was an invitor of plaintiff as to the short scaffold, then there is ample evidence that it did not fulfill its duty of due care. Harbor Ship made no effort at all to ascertain whether the short

scaffold was suitable or safe. If, as the evidence indicates, Harbor Ship assumed an element of control by making use of the scaffold for its own purposes, then it was under a duty to ascertain whether the scaffold could be used safely. A jury might reasonably find that Harbor Ship was not free to delegate that duty to Amship, and to assume that because Amship constructed it, it was safe.

*Is the doctrine of res ipsa loquitur applicable as to either or both defendants?*

There can be no doubt that the doctrine of res ipsa loquitur is applicable to a factual situation involving injury resulting from the collapse of a scaffold. This precise point was involved in *Nolen* v. *F. O. Engstrum Co.*, 175 Cal. 464 [166 P. 346], where the Supreme Court, in affirming a judgment for plaintiff, stated (p. 466): "Scaffolds built for such purposes do not usually break or fall with the weight of the workmen, if properly constructed. The fact that while the plaintiff was at work upon the scaffold it fell and precipitated him to the ground was of itself sufficient evidence that the scaffold was defectively constructed. The plaintiff testified that he felt the supports giving away at the time of falling. From this there would be a reasonable inference that the supports were insufficient, either because they were too weak to sustain the weight or because they were not sufficiently nailed. The doctrine of *res ipsa loquitur* applies."

Amship argues that the doctrine has no application where the injured person is a bare licensee. That is undoubtedly the law. (*Brust* v. *C. J. Kubach Co.*, 130 Cal.App. 152 [19 P.2d 845].) But, as already pointed out, it was for the jury to say whether plaintiff was an invitee or licensee. If the jury should find that plaintiff was a mere licensee, then neither defendant is liable, and the doctrine of res ipsa loquitur is not applicable. But, if the jury should find that plaintiff is an invitee as to either or both corporate defendants, then, as to such defendant or defendants, the doctrine is applicable.

Harbor Ship argues that the doctrine is not applicable to it because the scaffold was not within its "exclusive" management and control. The law does not prohibit the application of the doctrine against two or more defendants where there is joint control. (*Price* v. *McDonald*, 7 Cal.

App.2d 77 [45 P.2d 425]; *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].) It was for the jury to say whether either or both of these defendants had "control" of the scaffold, and if it should find that either or both had such control it should be instructed that the doctrine under discussion is applicable to that defendant or defendants.

▇▇▇ The argument of Harbor Ship that the doctrine is inapplicable because, so it is contended, plaintiff knows as much about the cause of his injuries—i. e., the collapse of the plank—as it does, is palpably unsound. It is true, of course, that plaintiff knows that he was injured by the collapse of the plank, but plaintiff has no way of knowing how or why the plank collapsed. If the jury should find that this defendant had joint control with Amship over the scaffold, it is quite clear as to plaintiff this defendant was in a superior position with respect to knowing how and why the plank collapsed. It must be remembered that the plank was available for inspection by the employees of this defendant after its collapse. The plank was not examined and was not produced at the trial, and neither this defendant nor Amship made any attempt to explain its disappearance. It is not the plaintiff's equal knowledge of the fact of injury that bars the application of the doctrine of res ipsa loquitur, but equal knowledge with defendant of the cause of the injury.

*Liability of the individual defendants.*

▇▇▇ The nonsuit was also erroneously granted as to the employees of Amship who were named defendants. Ames was leaderman of the crew that built the scaffold. Carlson was the safety inspector for Amship. There is ample evidence to require that the issue as to whether these employees were negligent should have been submitted to the jury. The jury could find that Ames did not exercise ordinary care in inspecting the planks, and that Carlson did not exercise ordinary care in inspecting the completed scaffold. If the jury should so find, then these defendants would be joint tort feasors with Amship.

The judgment is reversed.

Bray, J., and Finley, J. pro tem., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 8, 1947.