[Civ. No. 14560. First Dist., Div. One. May 14, 1951.]

GEORGE J. BILLETER, Appellant, v. RHODES AND
JAMIESON, LTD. (a Corporation) et al., Respondents.

138

Fitz-Gerald Ames, Sr., James F. Hoey and James A. Himmel for Appellant.

Joseph F. Rankin and Ricksen, Freeman & Johnson and Stanley C. Smallwood for Respondents.

PETERS, P. J.—George Billeter, the plaintiff, and foreman for the general contractor on a construction job, had three fingers of his left hand amputated while he was attempting to climb on a cement mixer owned and operated by Rhodes and Jamieson, Ltd., a subcontractor on the same job. Plaintiff brought this action against the subcontractor and its employee, Louis Robbiano, on the theory that he, the plaintiff, was, at the time of the accident, an invitee of the subcontractor, and that the defendants failed to supply him with a safe place in which to work or to warn him of the dangers involved in using the equipment. The jury brought in a verdict for the defendants, and, from the judgment entered on this verdict, plaintiff appeals.

DeLucca and Sons, as general contractor, had a contract to built a filter plant at Orinda, California. Respondent, Rhodes and Jamieson, had the subcontract to furnish the concrete. In performing this subcontract, dump trucks belonging to Rhodes and Jamieson would carry dry cement to the job and there it would be mixed in mobile cement mixers, called mixermobiles. A mixermobile is a large industrial type of cement mixer mounted on wheels. Attached to it is a wooden tower erected to the height from which it is desired that the cement should be poured. This equipment was moved from place to place as the requirements of construction necessitated. The subcontractor was supposed to have its mixermobiles spotted on the job as directed by the general contractor, and ready to pour cement by 8 a. m. of each work day. It usually required the cooperation of two men to set up and spot the equipment. Usually it was done by the operator of the mixermobile and a dump truck operator, both employees of Rhodes and Jamieson. Occasionally, however, the truck drivers would not arrive on the job at the proper time, in which event the plaintiff, Billeter, would assist the operators.

Billeter was the general foreman for DeLucca and Sons. One of his main duties was to see that everything was ready

to receive the poured concrete, and to see to it that the mixer-mobiles were properly spotted and ready to pour at 8 a. m.

Louis Robbiano was a mixermobile operator in the employ of Rhodes and Jamieson, and in charge of the specific piece of equipment involved in the accident. Admittedly, at the time of the accident, he was acting in the course and scope of his employment with Rhodes and Jamieson.

Toward the rear of the mixermobile is a large circular metal drum which revolves, in which the cement is mixed. Attached to the exterior of this drum is a metal flange or fin, which is a piece of metal welded to the outside of the drum and extending out 1½ to 2 inches from the drum. The drum so revolves that, on the right-hand side of the mixer, the metal fin comes from the top towards the bottom of the equipment. The purpose of this fin is to trip a counting and timing device located near the bottom of the drum by which a record is made of the number of revolutions of the drum. On the right-hand side of the mixermobile, and extending diagonally across and attached to the frame which encases and holds the drum, there is a steel bar, some two inches in diameter, which acts as a rigid brace for the equipment. As the drum revolves it passes underneath this stationary cross brace. From the surface of the drum to the underside of this cross brace is a little over 2 inches. But when the steel fin attached to the drum passed under the cross brace this distance was greatly reduced.

There was some dispute over the precise clearance between the fin and the cross brace. The witness Tillman, who was the superintendent in charge of the job for DeLucca and Sons, testified that the normal clearance between the fin and the inner surface of the cross brace was from one-half to three-quarters of an inch. Robbiano testified that the normal clearance was about a half an inch. Tillman testified that he examined the particular mixermobile here involved shortly after the accident occurred and that there was no clearance at all between the fin and the cross brace—in fact, the steel fin had cut into the cross brace about a half an inch. Robbiano testified that at normal speeds there is about half an inch clearance, but at high speeds, at least when the drum is loaded, the drum "climbs" towards the cross brace so that it rubs, and that this was characteristic of this model of mixermobile. At the time of the accident the drum was revolving at idling speed, with no mix in it.

Billeter testified that on the morning of the accident he had told Robbiano where to set up his mixer, and where to pour

the cement; that, there being no truck driver of Rhodes and Jamieson there that morning, he, at Robbiano's request, helped Robbiano to spot the equipment at the proper place; that Robbiano told him that he had lost some needle bearings used on the wooden tower machinery attached to the mixer, and asked him, Billeter, to help look for them; that Billeter found some of these bearings on the ground near the equipment and gave them to Robbiano who proceeded to climb up the equipment to insert the bearings where needed; that Robbiano called down to Billeter and asked him if he had found any more bearings, and, when Billeter replied that he had, Robbiano requested Billeter to hand them up to him; that Billeter went over to the right side of the mixermobile, placed his left hand on the cross brace and reached up with his right hand towards Robbiano; that Robbiano was so high on the machinery that he, Billeter, could not reach Robbiano's outstretched hand; that he, Billeter, then slipped his left hand further up on the cross brace, put one foot on the wheel hub of the mixermobile, and started to hoist himself up. His left hand was then at the point on the cross brace directly opposite to the rotating fin. As the fin passed the cross brace, there being insufficient clearance between the fin and the brace, the fin cut off three of Billeter's fingers.

Robbiano's story of the accident was substantially different from that told by Billeter. Robbiano admitted that, on prior occasions, he had asked Billeter to give him a hand in setting up the mixermobile, but he stated that on the morning of the accident he had performed this task himself, and that he did not see Billeter until after the mixer had been spotted; that Billeter then appeared on the scene while he, Robbiano, was picking up the bearings. Robbiano positively denied asking Billeter to assist him in finding the lost bearings. He testified that he had dropped the bearings and had found almost all of them when Billeter appeared and asked him what he was doing; that at this time he was going around the back end of the mixer and told Billeter that he was looking for the bearings; that he then climbed up on the machine and started to insert the bearings he had found. Robbiano remembered that Billeter picked up some of the bearings, but did not remember reaching down to get them from Billeter, nor did he remember that Billeter had tried to hand them up to him. He testified that, while he was inserting the bearings that he had found, Billeter called to him: "Here are three or four more"; that he simply replied "O.K." and nothing more; that he continued

to insert the bearings then in his possession, when, out of the corner of his eye, he saw Billeter start to climb up on the machine, and then the accident happened; that the accident happened so quickly that it was impossible to warn Billeter of the danger. He admitted that at no time did he warn Billeter of the danger created by the fin, and stated that there was no warning device or sign or guard on the machine indicating possible danger from grabbing the cross brace. He had never discussed with his superiors or fellow employees the fact that the fin was hitting the cross brace, nor had he ever discussed with them the possibility of putting up a safety guard or a warning sign.

Tillman contradicted a portion of Robbiano's testimony. He stated that, immediately after the accident, Robbiano told him that Billeter had been helping him set up the mixer, and that he asked Billeter to hand up the bearings that Billeter had found. Robbiano denied that such a conversation had taken place.

Tillman also testified that his instructions to Billeter were that Billeter should assist the mixermobile operators in setting up their equipment, and should also, when requested, help such operators repair their machines. Tillman knew that Billeter had been requested to and did perform such services in the past.

Billeter testified that, before the accident, he did not know that there was a steel fin on the revolving drum; that no one had ever warned him about this fin; and that he had no knowledge of the clearance between the fin and the cross brace. He admitted, however, that he had worked around this and similar mixermobiles for several months, had helped to spot them and set them up, and had helped to repair them. For 25 years or more he had worked around heavy construction jobs and was familiar with heavy construction equipment, including cement mixers. For five months in 1945-6 he had operated a business for himself doing concrete work. He admitted that he knew that there were various kinds of counting devices on cement mixers, but asserted that he did not know about this metal fin type of counter. He also testified that it was not his duty to check the number of revolutions made by each mixer, that task being performed by an inspector of the East Bay Municipal Water District.

The accident happened on the right-hand side of the mixer. On that side there is no device specially constructed for the purpose of assisting those desiring to climb up on the machine.

On the left side of the mixer, however, is a steel ladder leading from the ground to the operator's platform. Had Billeter used this ladder he would have avoided the revolving drum without danger, but he would have had to climb from the operator's platform to the platform, on the right side of the equipment, where Robbiano was inserting the bearings. Billeter admitted that he knew that the mixer was equipped with this ladder, but denied ever using it to get to the operator's platform. Robbiano testified that Billeter had used the ladder several times to get to the platform.

Appellant first urges insufficiency of the evidence to support the verdict. In this connection he urges that the evidence shows that he was in a place in which he was required to be as foreman; that there is no evidence that he left a place of safety and went into a place of danger; that he had no knowledge that there was not sufficient clearance between the fin and the cross brace to prevent the cross brace from being used as a hand hold; that the relationship between Rhodes and Jamieson and appellant was that of invitor and invitee; that Rhodes and Jamieson was bound to exercise ordinary care to provide appellant with a reasonably safe place in which to work, and with reasonably safe appliances and equipment.

It is undoubtedly the law that an invitor owes to an invitee the duty to exercise ordinary care towards an invitee, and to provide him a reasonably safe place in which to work. The correct rule was thus stated in *Miller* v. *Pacific Constructors, Inc.*, 68 Cal.App.2d 529, 545 [157 P.2d 57]:

''The general rule in that regard is that an owner or occupier of premises, who, by invitation express or implied, whether the invitation is pursuant to a written contract or otherwise, induces, or knowingly permits, a workman to enter the premises for the performance of duties mutually beneficial to both parties, is required to use reasonable care to protect the workman by supplying him with a reasonably safe place in which to work and to furnish and maintain appliances in connection therewith which are reasonably safe for the purposes embraced therein. [Citing a case.]

''It is true that a contractor is not ordinarily liable for injuries sustained by a workman as a result of defects which are clearly visible or obvious to him, or when he has actual or constructive knowledge of the existence of such defects. . . . That principle is so well established that it requires no authorities to support the doctrine. But it is equally well settled that a workman is not charged with knowledge of a latent or

concealed defect and that he may recover damages resulting from such latent defect of which he has no knowledge, provided the employer or licensor knew, or by the exercise of reasonable care should know of such defect and fails to remedy or warn the workman of that danger.''

It is also true that an invitee is not required to look for hidden traps. Appellant correctly relies upon the following rule stated in *Emery* v. *Pacific T. & T. Co.*, 43 Cal.App.2d 402, 409 [110 P.2d 1079]:

''The employee is not required to use any degree of care or diligence to discover defects. He will be held to have assumed the risk only when he knew, and will be held to have known when the defect was so obvious that he must have known or simply refused to open his eyes and see, or when he was put upon inquiry by some discovery or suggestion of danger which it was gross carelessness for him to neglect.

''This principle is as applicable to an invitee, as was plaintiff, as to that of an employee.''

There can be no doubt that in a proper case an employee of the main contractor or of a subcontractor may be an invitee of another subcontractor. Whether an employee of one contractor is an invitee or licensee of another contractor, or is a trespasser, is normally a question of fact. (*Biondini* v. *Amship Corp.*, 81 Cal.App.2d 751 [185 P.2d 94].)

Moreover, it is the law that a person may be an invitee as to one portion of the premises, and a mere licensee or even a trespasser as to other portions, and that the question as to extent of the invitation is one of fact and not of law. (*Biondini* v. *Amship Corp.*, supra, p. 760; *Gastine* v. *Ewing*, 65 Cal.App.2d 131 [150 P.2d 266]; *Buckingham* v. *San Joaquin Cotton Oil Co.*, 128 Cal.App. 94 [16 P.2d 807]; *Dobbie* v. *Pacific Gas & Electric Co.*, 95 Cal.App. 781 [273 P. 630]; *Medcraft* v. *Merchants Exchange*, 211 Cal. 404 [295 P. 822]; *Scott* v. *Fuller Co.*, 41 Cal.App.2d 501 [107 P.2d 55].) Respondents, in this connection, comment on the evidence of Robbiano that he had not asked appellant to assist him in finding the bearings, and had not asked him to climb on the equipment and hand the bearings to him. They also point out that the jury could have found that, even though appellant was an invitee as to part of the mixer, the means he used to climb thereon were not the usual or proper means, so that the jury could have found that the implied invitation did not extend to the portion of the mixer on which the accident occurred. They point out that there was a steel ladder, of

which appellant had knowledge, on the left side of the equipment that had been installed for the use of those who desired to climb on the equipment. This is evidence of a weak type it is true, that supports the implied finding of the jury that appellant was not invited by Rhodes and Jamieson to use the cross brace in the fashion in which it was used.

 Even if appellant were an invitee he could not close his eyes to dangers that were obvious, and blindly enter a place that he knew or should have known was dangerous. If he was contributively negligent he may not recover. (*Hill* v. *Eaton & Smith,* 65 Cal.App.2d 11 [149 P.2d 762]; *Miller* v. *Pacific Constructors, Inc.,* 68 Cal.App.2d 529 [157 P.2d 57].)

 The test is whether the invitee acted as a reasonably prudent person under the circumstances. In the present case contributory negligence was pleaded by respondents. Whether an invitee is or is not contributively negligent is a question of fact. In our opinion, the evidence, and the reasonable inferences therefrom, although conflicting, are sufficient to support the implied finding that appellant was contributively negligent. The evidence shows that appellant had worked on heavy construction jobs for some 25 years and was thoroughly familiar with construction equipment, including cement mixers. He was thoroughly familiar with the mixer here involved, having assisted the operator not only in setting it up, but also in repairing it. One of his duties was to see that this particular machine was properly set up and ready to pour at 8 a. m. Large photographs of the equipment were introduced into evidence. They show the drum, the fin and the cross brace quite clearly. They demonstrate that the fin was on the outside of the drum and clearly visible. From this evidence the jury could, and evidently did, find that appellant did not act reasonably in grabbing the cross brace—that he knew, or should have known, of the existence of the fin and its proximity to the cross brace. This being so, the evidence is sufficient to sustain the judgment.

Appellant next objects to certain instructions on contributory negligence. The first told the jury that one cannot go from a place of safety into a place of danger without using his eyes or ears to see or hear anything that might be a source of danger, and that if the danger is visible and obvious the law will presume he saw it. The second was a normal and correct instruction on contributory negligence. The third told the jury that "Whether or not it is negligence for one to proceed into a dangerous situation of which he had previous notice is

a question of fact not always and necessarily to be answered in the affirmative. If at the time he was aware of the danger and also appreciated its extent, and if he voluntarily and unnecessarily exposed himself to it, then he was negligent as a matter of law. But to forget a danger once known to exist or to be in a state of abstraction or absent-mindedness may or may not be negligent, depending on whether or not in the circumstances it shows a want of ordinary care. Also the jury must consider the character of the notice received, whether recent or remote, and the impression such information would make upon the mind of an ordinary prudent person in a like situation.''

The main attack on these instructions is not on their form but on the ground that there was no evidence to warrant the giving of any instruction at all on the issue of contributory negligence. As already pointed out, there was substantial evidence, and reasonable inferences therefrom, on this issue not only sufficient to warrant the giving of instructions on the issue, but to sustain the implied finding that appellant was contributively negligent.

After the record was filed in this court an amendment to the reporter's transcript was filed setting forth some 21 instructions proposed by appellant and refused by the trial judge. In his opening brief appellant claims that it was error not to have given these 21 instructions. He only sets forth some six of the 21 instructions, simply referring to the other 15 by a reference to their numbers and pages where they appear. Under such circumstances this court is under no duty to, and will not, discuss the instructions not argued. As was said in *Estate of McDonald,* 191 Cal. 161, 171 [215 P. 545] : ''It is not a sufficient predicate for a claim of error that instructions which properly state the law have been rejected. The assignment must go further and point out wherein the subject of the instruction was not in fact covered by those actually given.'' (See cases collected 2 Cal.Jur. p. 730, § 421, at p. 731.) In his reply brief, appellant practically concedes this to be the rule, and, in effect, abandons his assertion of error as to these 15 instructions. (App. Closing Br. p. 17.)

The other six refused instructions all relate to the doctrine of res ipsa loquitur. The court did not instruct on this issue, and appellant urges that he was entitled to instructions on this doctrine.

Of course, it is the law that each party is entitled to have his theory of the case go to the jury when there is sub-

stantial evidence to support the theory in question. (*Stickel* v. *Durfee,* 88 Cal.App.2d 402 [199 P.2d 16]; *Ferrula* v. *Santa Fe Bus Lines,* 83 Cal.App.2d 416 [189 P.2d 294].) The question then is whether the evidence heretofore reviewed warrants an instruction on the doctrine.

██ It is well settled that a triad of conditions must exist before the doctrine may be applied.

"The doctrine of res ipsa loquitur has three conditions: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." (*Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]; see, also, *Raber* v. *Tumin,* 36 Cal.2d 654, 659 [226 P.2d 574].)

██ The doctrine is not applicable to the facts here involved because all the parties knew the facts relating to the injury. They all knew not only how the appellant was injured, but why he was injured—there was insufficient clearance between the fin and the cross brace. Under such circumstances the doctrine should not be applied.

The California authorities on this subject are by no means consistent and clear. It is possible to find authority in this state for many different statements of the elements of the doctrine. (See cases collected and commented upon in *Leet* v. *Union Pac. R. R. Co.,* 25 Cal.2d 605 [155 P.2d 42, 158 A.L.R 1008]; see, also, an excellent article on the subject by William L. Prosser entitled "*Res Ipsa Loquitur in California,*" in 37 Cal.L.Rev. 183.)

Regardless of this apparent conflict, it is perfectly clear that, where the evidence of how and why the accident occurred is equally open and known to all parties, the doctrine has no application. As was stated in *Ybarra* v. *Spangard,* 25 Cal.2d 486, 490 [154 P.2d 687, 162 A.L.R. 1258], quoting from Wigmore on Evidence: "If the doctrine is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.'" (See, also, *Alexander* v. *Wong Yick,* 25 Cal.App.2d 265, 268 [77 P.2d 476].) In the instant case we cannot say, under the

facts or from common experience, that this accident was more likely caused by respondents' than by appellant's negligence. The probability that the accident was caused by appellant's negligence is equally as great as that it was caused by the negligence of respondents. As was said in *Raber* v. *Tumin* 36 Cal.2d 654, 659. [226 P.2d 574] : "It has also been more specifically pointed out that 'the applicability of the doctrine of res ipsa loquitur depends on whether it can be said, in the light of common experience, that the accident was more likely than not the result of their [defendants'] negligence. [Citations.] "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply." ' "

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1951. Gibson, C. J., and Carter, J., voted for a hearing.