[Civ. No. 6845. Fourth Dist. Sept. 7, 1962.]

ARTHUR DALE PUFFINBARGER et al., Plaintiffs and Appellants, v. S. KIRBY DAY, JR., Defendant and Respondent.

W. Mike McCray for Plaintiffs and Appellants.

Jacobs, Jacobs, Nelson & Witmer and M. Lyle Nelson for Defendant and Respondent.

542

GRIFFIN, P. J.—Plaintiffs-appellants Arthur Dale Puffinbarger and wife, in this wrongful death action, seek damages against defendant-respondent S. Kirby Day, Jr., M.D., alleging that plaintiffs were the father and mother of decedent Dana Puffinbarger; that on May 13, 1958, plaintiff wife took her daughter to defendant doctor for treatment of a boil abscess; that the child was taken by the doctor to the examination room and two or three hours later plaintiff wife was advised of the death of her 2½-year-old daughter as a result of the lancing of a boil; and that the child's death was due to negligent diagnosis and treatment by the doctor.

Defendant answered, denied any negligence on his part, and contended that the child's death was in no way attributable to his treatment, but was caused as a result of a toxic condition resulting from the infection caused by the boil, and set up the affirmative defense of contributory negligence of plaintiffs in that they failed to exercise proper care, custody and control of decedent, to properly limit and control her activities when she was sick and in a weakened condition due to an infection, and failed to properly care for her during this time.

The issues as presented in the pretrial order were: (1) Was the defendant guilty of malpractice? (2) Was said malpractice the proximate cause of death? (3) Were the plaintiffs negligent in the care of the child? (4) If the defendant is liable, what is the amount of plaintiffs' damage? It was also submitted that plaintiffs contended that the doctrine of res ipsa loquitur applied because, as a matter of common knowledge, a child properly treated for a boil does not die as a result thereof.

A trial of the issues resulted in a verdict in favor of defendant and against plaintiffs. A motion for new trial was denied. Plaintiffs appealed and contend (1) that the trial court erred in giving defendant's instruction on contributory negligence (BAJI 103.1 [rev.], BAJI 131 [rev.], 206 [rev.], and 206-A [rev.] [res ipsa loquitur]) and (2) that there was no sufficient proof of contributory negligence on the part of plaintiffs to justify the giving of such an instruction.

## EVIDENCE

Plaintiff wife testified generally that she first noticed a boil on her daughter the Thursday prior to her death; that it was located on the left side behind the left shoulder; that the next day, Friday, May 9, 1958, she took the decedent to see the defendant doctor and he prescribed treatment con-

sisting of a shot of penicillin, and hot packs to be applied for 15 minutes every three or four hours, together with baby aspirin if a fever arose; that the next day, plaintiff wife took decedent back to the doctor's office where he gave the girl a second shot of penicillin, placed a bandage over the boil and gave the mother the same instructions as before; that the next day, Sunday, the daughter was visiting with her father (who had separated from the mother) from 11 a. m. to 5:30 p. m.; that when the child was returned that evening, the mother did not notice the boil being any worse; that the next day the girl's mother telephoned the doctor and advised him that there was neither fever nor anything, and the doctor advised her to merely continue the hot packs and if a fever should come up, or the boil start to look bad, to call him; that the next morning at about 11 a. m., plaintiff mother again called the doctor and advised him that her daughter was still having trouble with the boil and was being kind of "cranky"; that she then made a 1:30 p. m. appointment to see the doctor; that that morning decedent played outdoors with other children, riding on her tricycle, and then, after being dressed to go to the doctor's office, got herself dirty and that the mother gave her a couple of "swats"; that the daughter did not appear to be sick and she did not have any fever; that they arrived at the doctor's office at 1:20 p. m., saw the doctor at 2 p. m., and that he merely examined the boil, left and then returned at 2:30 p. m.; that at this time the doctor told plaintiff wife that the boil was not getting any better and that he would have to open it; that he took the girl into another room, and at 4:30 p. m. the doctor next saw the mother and advised her of the death of her daughter. On cross-examination, plaintiff wife stated that on Friday night when she saw Dr. Day after hours, the child was sick; that on the Monday night before the child's death, plaintiff wife's father, upon seeing the child, stated, "You better take that kid to the doctor. I've seen kids die with worse than a boil"; that in taking the child's temperature, the mother used a regular mouth thermometer and not a baby fever thermometer; that on Tuesday, immediately before going to the doctor's office, she verified that in getting dirty her daughter rode her tricycle through some sprinklers, getting wet, and that while waiting at the doctor's office the decedent was fussy until she fell asleep. Plaintiff father testified that on the Sunday before his daughter's death, he picked the daughter up at 11 a. m. and had her with him until approxi-

mately 5 p. m.; that he noticed nothing unusual about his daughter's condition, except the boil, and the child was allowed to play with other children; that when he picked the child up, his wife instructed him to rebandage the boil if it got dirty or soaked from drainage, but made no mention of applying any packs to it; that at no time while he had the child was she put to bed; and that the bandage was changed on one occasion.

 Defendant doctor testified that his records indicated that on the evening of May 9 he made a notation that decedent had an abscess, a large boil, in the left axilla, for which he gave 2 cc. of a combiotic and instructed that hot soaks be applied; that the following day he made a notation that the boil had improved, evidently coming to a head, so that he expressed a small amount of pus from the wound; that he again advised the mother to continue the same hot packs; that on May 13 he first saw the mother and Dana in one of the small examining rooms about 2 p. m.; that at that time he examined the boil and stated that the child appeared to be sick, feverish and drowsy; that it was his opinion that she was sick because of the boil and that it should be opened in order to drain; that at 3 p. m. he commenced his treatment of the boil and first injected into Dana an anesthetic known as Xylocaine; that after the injection he opened the boil and expressed out and let drain the thick pus that was in the wound; that he was then applying a dressing when the child's eyes rolled back into her head and she went into convulsions; that she lived for approximately 30 minutes, during which time oxygen, an intravenous injection of 5 per cent glucose and water, and an intravenous pentathol, 100 milligrams, were administered; that mouth-to-mouth breathing was performed and artificial respiration administered, all to no avail; that it was his opinion that the cause of death was repeated febrile convulsions due to fever and the fact that Dana had a large abscess on her side; that he felt that the administration of Xylocaine had no effect whatsoever upon the cause of death and based this on the child's being ill, and the fact that in the autopsy report no Xylocaine was found in the blood specimen. It was the doctor's opinion, when he saw Dana at 2 p. m., that he should have seen her at least 24 hours previously. He also testified that he was aware of the fact that if Xylocaine were to get into the bloodstream and be carried to the heart, it could cause a cardiac arrest; that he had on this occasion made seven punctures to inject Xylocaine one inch from the

periphery of the boil itself; that he was not absolutely sure, when he injected the seven punctures, that he was not puncturing into the infected area; that the abscess was approximately 2 inches by 1½ inches in circumference; and that the needle injection marks were beyond the outside of the one centimeter in multiple areas.

There was testimony that in examining the decedent's blood to determine what drugs were present, the only one found was pentathol; that this was the only examination made by the laboratory and that there was no test made to determine whether there was any toxicity from disease.

A deputy coroner, also a physician and surgeon, testified that he performed an autopsy on deceased on May 13 and so reported; that as a result thereof, he was of the opinion that the child had died from anaphylaxis due to sensitivity to Xylocaine, and other conditions present were noted to be toxemia due to coagulose positive, hemolytic staphylococci from post-axillary abscess. He gave his reasons for his opinion. Complaint is made in reference to certain cross-examination, which we will discuss later.

The trial court allowed the jury to consider the question of contributory negligence under the instruction given. Plaintiff claimed that this evidence would not, as a matter of law, support a verdict based on contributory negligence and that it was error to give it. (Citing such authority as *Christensen* v. *Bocian,* 169 Cal.App.2d 223 [336 P.2d 1018]; *Kollert* v. *Cundiff,* 50 Cal.2d 768, 771 [329 P.2d 897].)

The general rule is stated in *MacLean* v. *City & County of San Francisco,* 151 Cal.App.2d 133, 138 [311 P.2d 158], to be that:

" 'In considering the testimony with a view to determining whether, as a matter of law, there was sufficient evidence to justify the court in giving the instructions complained of, this testimony must be considered in a light most favorable to respondent, for in order to find that the giving of any certain instruction was not warranted by the evidence, the court must find that, as a matter of law, there is in the record not even slight or inconclusive evidence on the point covered by the instruction.' "

That opinion cites 53 American Jurisprudence, page 457, to the effect that:

"In determining whether there is evidence that will warrant an instruction, the court does not pass on the weight and sufficiency of the evidence. It is not error to submit an

instruction covering a theory advanced by a party if there is any evidence on which to base it, although it may be slight and inconclusive, or opposed to the preponderance of the evidence.''

See also *Billeter* v. *Rhodes & Jamieson, Ltd.,* 104 Cal.App. 2d 137, 146 [231 P.2d 93], and *Garcia* v. *Conrad,* 40 Cal.App. 2d 167, 170 [104 P.2d 527]. ██ Before an appellate court is justified in holding the giving of such instruction to be error, it must find, in a light most favorable to respondent, that, as a matter of law, there is in the record not even slight or inconclusive evidence on the question of contributory negligence. (*MacLean* v. *City & County of San Francisco, supra,* 151 Cal.App.2d 133.) There are authorities holding and it is generally recognized, that disobedience of the physician's instructions as to medication, care and activities during treatment or after surgery, may constitute contributory negligence. (*Preston* v. *Hubbell,* 87 Cal.App.2d 53 [196 P.2d 113]; *Welker* v. *Scripps Clinic etc. Foundation,* 196 Cal.App.2d 338 [16 Cal.Rptr. 538]; 50 A.L.R.2d 1043, 1052.) BAJI Instruction No. 214-V provides for such an instruction. ██ Although it is a close question as to whether the facts related may constitute the defense of contributory negligence, we feel constrained to hold with the trial court on its ruling that there was sufficient evidence to submit the question to the jury.

## Res Ipsa Loquitur

Prejudicial error is claimed because the trial court gave BAJI No. 131 [rev.], as well as BAJI No. 206-A [rev.] and BAJI No. 206 [rev.] (in reference to the res ipsa loquitur rule). Under these instructions, the question whether the res ipsa loquitur doctrine applied was left for the determination of the jury. Apparently, the jury found against its application or against the inference of negligence. ██ Under the evidence presented, the court was authorized in leaving the question of its application to the jury. (*Borenkraut* v. *Whitten,* 56 Cal.2d 538 [15 Cal.Rptr. 635, 364 P.2d 467]; *Johnson* v. *American Casualty Co.,* 194 Cal.App.2d 367 [15 Cal.Rptr. 17].) A proper instruction on the question of negligence of the physician and surgeon in a malpractice case was given in BAJI Instruction No. 214.

██ Complaint is made charging prejudicial error of the court in giving an instruction under BAJI Instruction No. 131 [rev.], to the effect that:

''The mere fact that *death* occurred, considered alone, does

not *prove* that it was caused by the negligence of anyone." (Italics ours.)

This instruction is worded differently than the one stating that:

"The mere fact that an accident happened, considered alone, does not *support* an inference that some party, or any party, to this action, was negligent." (Italics ours.)

This last quoted instruction was criticized in *Guerra* v. *Handlery Hotels, Inc.*, 53 Cal.2d 266 [1 Cal.Rptr. 330, 347 P.2d 674].

Since the res ipsa loquitur inference did not arise as a matter of law, we see no prejudicial error in giving the instruction. (*Winningar* v. *Bales*, 194 Cal.App.2d 273 [14 Cal.Rptr. 908]; *DeMartini* v. *Alexander Sanitarium, Inc.*, 192 Cal.App.2d 442 [13 Cal.Rptr. 564].)

In this connection, it is pointed out that the trial judge, in examining the jurors on *voir dire*, did question the jurors as to their general frame of mind in malpractice cases and asked if any were in the frame of mind of those "who have the feeling that the fact that the child died after treatment, is in itself, a showing of negligence on the part of the doctor?" There was no response from the jurors. Objection was then made, out of the presence of the jury, to this general statement, claiming that res ipsa loquitur was involved in the case and such an instruction told the jury that the res ipsa loquitur inference was not applicable. The objection was overruled, with the statement: "I am sure it will be taken care of." (Possibly by proper instructions on the subject.)

We see no prejudicial error in the inquiry when considered with the instructions given, leaving the question of the application of the doctrine to the jury.

Lastly, counsel for plaintiff attacks counsel for defendant and claims that he exceeded the limits of cross-examination of the autopsy surgeon, Dr. Brandt, who was called as plaintiff's witness. The doctor testified that he performed the autopsy for the purpose of determining the cause of death; that cultures were taken from the abscess itself, the heart blood, lungs and cerebrospinal fluid, and that he concluded that the cause of death was anaphylaxis due to sensitivity to Xylocaine. Other conditions present were noted to be toxemia due to coagulose positive, hemolytic staphylococci from post-axillary abscess. Toxemia is a condition of the body resulting from the effect of poisonous products from organisms, such as the staphylococcus. Dr. Brandt testified that the infection

was so extensive that the child did have a toxemia and that this condition would create a toxicity in the body itself. On cross-examination, over objections, Dr. Brandt stated: "I don't think it is possible to tell in advance of an anaphylaxis reaction, regardless of what the foreign material is, whether or not a person is going to have this problem or not. I don't think there is any way of knowing." He added that even a bee sting or other types of anesthetics could cause anaphylaxis. He was then asked, "Doctor, assuming a child two and a half years old was taken into a doctor's office, had a boil on the . . . back of the shoulder, and it was inflamed—pussy, and the child was ill, hot, and the doctor used Xylocaine around the area outside of the area of redness or inflammation for the purpose of expressing the boil. Would you consider that as a recognized general practice of physicians in the area of Orange County?" Over objection, he answered, "I think the answer to that question, you have to have more information about any one specific case. There are various degrees of illness and sickness and in every degree, you might say, you would have a different type of approach. It would be a very difficult question to answer. I would say at times it is done and other times it isn't." He indicated that at times there are physicians and surgeons who would follow that general practice in the area and others who wouldn't use anything.

In *Verdelli* v. *Gray's Harbor etc. Co.*, 115 Cal. 517, 526 [47 P. 364, 778], it was held that if a person wished to ask hypothetical questions of a witness on matters not a subject of direct examination, he must take the witness as his own witness. See also *Houghton* v. *Jones*, 68 U.S. (1 Wall.) 702 [17 L.Ed. 503]; Witkin on Evidence, 1958 Edition, section 627, page 674.

It is the general rule that cross-examination should be confined to matters that were elicited on direct examination. (Code Civ. Proc., § 2045; 54 Cal.Jur.2d § 113, p. 462, and authorities cited.)

The result of an allowance of improper examination is that if the party examines the witness as to other matters, such examination is to be subject to the same rules as a direct examination, i.e., that he will be "bound" by the testimony in the sense that it will be considered evidence offered by himself, or the judge may prevent the improper examination. The scope of cross-examination, particularly with regard to a doctor testifying as an expert witness as to his findings and conclusions, may well include testimony which has a

logical tendency to rebut any unfavorable inferences which might have been drawn from the direct examination. ▮ Testimony which will test the credibility of the witnesses, the actual limits being largely a matter of discretion with the trial court, and, specifically with regard to a doctor testifying as an expert witness as to his findings and conclusions, a wide latitude is allowed on cross-examination. (*People* v. *Sehorn,* 116 Cal. 503, 511 [48 P. 495] ; *Chula* v. *Superior Court,* 109 Cal.App.2d 24, 39 [240 P.2d 398] ; *Hope* v. *Arrowhead & Puritas Waters, Inc.,* 174 Cal.App.2d 222 [344 P.2d 428] ; *Costa* v. *Regents of University of Cal.,* 116 Cal.App.2d 445, 465 [254 P.2d 85] ; *Meyer* v. *McNutt Hospital,* 173 Cal. 156, 158 [159 P. 436].)

▮ Even though it may appear that defendant went beyond the bounds of cross-examination in propounding the question in reference to certain acts of defendant measuring up to the standard of practice of other general practitioners practising in that area, we perceive no prejudicial error, since the other expert witnesses called by the defendant related about the same opinion, i. e., that at times there are physicians and surgeons who would follow the general practice in the area and others who would not use any anesthetic.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.