[Civ. No. 14205. First Dist., Div. One. Jan. 20, 1950.]

RICHARD BOUCHER, Respondent, v. AMERICAN BRIDGE COMPANY, Appellant.

Walter Shelton and James F. Hoey for Appellant.

Palmquist & Sugden and Stanley C. Smallwood for Respondent.

BRAY, J.—In an action for damages for personal injuries, a jury verdict awarded plaintiff $18,600. From the judgment entered thereon, and after denial of a motion for new trial, defendant appealed.

### QUESTIONS INVOLVED

Primarily the questions involved depend upon the duty owed in the construction of a building by one independent contractor to the employees of another independent contractor. The questions raised are: (1) alleged insufficiency of the evidence to prove negligence on the part of defendant; (2) alleged assumption of risk by plaintiff; (3) alleged contributory negligence by plaintiff; (4) alleged error in refusal of certain instructions.

### FACTS

There is practically no conflict in the facts as to the accident. There is some conflict on the question of plaintiff's right to be at the point from which he fell. Columbia Steel Company was building a mill near Pittsburg, California. Defendant was employed to furnish and erect the structural steel framework. Plaintiff was an employee of Fischbach and Moore, who were employed to install the electrical work on the steel framework. The roof structure was under construction, and as the structural steel was put up, plaintiff and his fellow employees followed with their electrical installation. Starting from the west end of the building, there was a steel truss every 20 feet, set across the building, from side to side (north and south). Each truss was in the form of a triangle, that is, there was a horizontal beam running parallel to and

about 35 feet from the ground and two others sloping upwards to form a peak. Between the base and the other two parts were vertical and diagonal bracings. The distance between two trusses is called a "bay" and was in this case 20 feet. On top of the upper arm of the trusses, and crosswise to them (parallel to the length of the building) are attached "purlins." Each is about 8 inches deep and has two 3-inch flanges, facing the same direction. They are placed with the flanges facing up the slope toward the peak of the roof, and are spaced about 5 feet apart, going from the peak of the roof down to the eave at the side of the building. It is upon these purlins that the roofing eventually rests. However, no roofing had been placed on the building at the time of the accident here involved. In order to strengthen the purlins, "sag rods" are used. They run crosswise to the purlins (parallel with the trusses—north to south) and are about three-fourths of an inch in diameter. Holes are drilled in the purlins, a rod is placed joining two purlins, and nuts are screwed on the ends of the rod protruding from the holes. Two sag rods were installed in each bay (space between two trusses) about 6 feet and 9 inches from either truss.

At the time of the accident the steelworkers had moved from west to east and had installed all of the sag rods west of truss No. 23. Just east of truss No. 23 sag rods had been placed on top of the purlins but not attached permanently. They were placed with the lower end resting on the lower flange of a purlin and the upper end resting on top of the next purlin. They were closer to truss No. 23 than would be their final permanent position. The custom in the trade was to bring up all the sag rods for one bay, resting each rod on the purlins as described, and then to put the sag rods permanently in place, working down from the peak of the roof. On the day of the accident the steelworkers began on the bay east of truss No. 23 in the afternoon after lunch, and were hoisting up the rods, laying them in the temporary position. The accident occurred at about 3 p. m.

The electrical workers were putting up four rows of lights extending the length of the mill, on the underside of the horizontal trusses. They worked on platforms supplied by plaintiff's employer. The contract between Columbia Steel and the electrical contractor required the latter to provide ladders and platforms for electrical workers. Plaintiff was about to descend to the ground from a platform on which he had been working. There was evidently no ladder from that

same platform. In order to go down the ladder he had used in getting up, he would have had to go along 50 feet on a steel truss, 150 feet on a different scaffolding, and another 30 feet on structural steel. Plaintiff saw a ladder on the south wall of the mill, which was only about 30 feet away, and could be reached by walking along the horizontal beam of truss No. 23. He had never before walked along that truss because his work had not yet brought him into that area. However, he had never been restricted as to what ladders to use and the custom was that most trades used the most convenient ladder they saw. As he started moving along the truss toward the south side of the building he grasped braces to help support himself. He did not test each one to see if it was secure, because he depended upon a trade rule that everything set high up over an open area should be secure. As he moved toward the south side of the building he had to go around one of the braces on the truss. He held on to the brace with his right arm and reached up with his left arm, taking hold of a sag rod which he saw on top of the purlins, about 3 feet to his side. It appeared to be secure when he took it. It pulled loose, so that he had nothing holding him up, and he fell to the ground 35 feet below, landing on his feet, receiving serious injury.

At the moment of his fall, plaintiff's fellow workers did not see any steelworkers in the area. The men installing the sag rods were Jeffrey, Henley and Steadman. They testified that at the time of the accident Henley was up on the roof where the rods were being placed, Jeffrey had been on the roof and was moving down to the truss, where rods were received from below, and Steadman was on the ground, obtaining more rods.

As to the right of plaintiff to be on the unfinished truss, he testified that the steel the electricians had been working on had all been fastened down and that "We had learned to rely on the steel and knew that it was a trade practice to put everything up in a safe and workmanlike manner and so located that it would not endanger the lives of the others working in the area"; that no restrictions were placed on the electricians in the use of ladders, and that all of the trades used the "most convenient and handiest ladder" they saw; that he had taken hold of sag rods before and that he had never seen any that had not been secured, nor laid close to the top of the truss (as they were at the time of the accident). Plaintiff had worked in this particular building for about a week, 90 per

cent of which time he was up on the roof structure. When asked on cross-examination if anyone from defendant had ever told him it was all right to go to the place from which he fell, he answered that his employer's foreman had instructed him to go to work on this section. There is no evidence that he received any instructions from any of defendant's employees. Witness Nelson, also an electrician, testified that it was the custom in moving about the building to take hold of the framework and to rely upon the custom that "everything is secured down if it is hoisted aloft in an open area." Another electrician, Chiartano, testified to the same effect, even if steel were "brought up there temporarily."

As opposed to this testimony the defendant's superintendent, Schultz, testified that the method of leaving the sag rods temporarily unsecured was the method customarily used in this type of construction (others of defendant's employees testified to the same effect) ; that "My practice out there is that I would not allow any other trade to work ahead of the unfinished business—unfinished structure, I should say. We had a lot of ups and downs in that respect." He further testified that the electricians were supposed to follow up the finished part—install their electrical work on that portion of the steel structure that was finished. There is no testimony that the electricians had express permission to go on the truss in question, nor is there any testimony that they were instructed not to go on an uncompleted truss, other than the statement of the superintendent to the effect that his practice there was not to allow any other trade to work ahead of the unfinished business. This is not evidence that he or anyone else had told the plaintiff or the other electricians not to work ahead of the finished steel. That the other trades did work ahead in this respect might be evidenced by the superintendent's statement, "We had a lot of ups and downs in that respect."

While it is not strong, there is evidence from which a jury could find that plaintiff and the other electricians were following the steelworkers, used ladders of the steelworkers as well as their own, had not been told not to use an uncompleted truss (there was no evidence of their being told when a truss was completed), and that under all the circumstances of the case there was an implied invitation to plaintiff to use the truss in question to get to the nearest ladder. The jury having found that there was such invitation, there was sufficient evidence, in view of the testimony concerning the custom that steel aloft was always secured and that the plaintiff and the

other electricians always relied on that custom, to support a finding of negligence on the part of defendant in leaving the sag rods unsecure, at least without some warning to the oncoming electricians.

2, 3. ASSUMPTION OF RISK AND CONTRIBUTORY NEGLIGENCE

Under the circumstances of the case, particularly in view of the testimony concerning custom and practice in the erection of steel, we cannot say as a matter of law either that plaintiff assumed the risk or that he was contributorily negligent. These were matters for the jury.

### 4. INSTRUCTIONS

A more serious situation arises in connection with the instructions given and refused. The court instructed, in effect, that defendant owed the duty not only to refrain from the infliction of wilful and wanton injury on, but to exercise ordinary care for the safety of, plaintiff and the other employees of Fischbach and Moore; that defendant was under no duty to warn plaintiff against obvious and patent perils, if such in fact existed; that defendant was required to exercise only such care for plaintiff's safety as would not amount to a violation of the ordinary practice and custom usually followed in installing sag rods under the same or similar circumstances; that if the jury found that defendant's steel work was unfinished and still in the course of construction, "the long continued use by plaintiff of finished steel work for his support did not justify . . . [the] use by him of obviously unfinished steel work for that purpose"; that plaintiff was required to exercise the care and caution of an ordinarily prudent person and "to observe the obvious hazards of the position in which he had placed himself" and had "no right to assume that the unfinished steel work in process of construction had been completed and could be safely used for his support"; that if the jury found "the only duty of the defendant American Bridge Company was to erect the structure of steel in an orderly manner in which work of that kind should be performed and that Fischbach and Moore and plaintiff, its employee, was not to install the electrical work until after such steel had been erected, by defendant, then defendant was not under any obligation to plaintiff to depart from the normal, customary and usual methods of steel erection of this kind"; that in determining the amount of care and caution required of plaintiff for his own safety the jury might consider the custom and practice, if any, "with reference to safety precautions followed

by steel framework constructors in securing and fastening steel rods or members in buildings under construction in the area where this accident occurred'' if plaintiff knew of and relied on said custom; that the jury could consider the evidence, if any, as to whether defendant had violated any safety practice customarily followed in the area and known to plaintiff; that if defendant did not know and did not have any reason to believe that plaintiff would use the sag rod for his support, defendant was under no duty to warn plaintiff not to use it.

█ It is obvious from the foregoing abstract of the instructions given that the court assumed that plaintiff had a right to be on the truss from which he fell and that defendant owed him the duty of ordinary care. It referred to the fact that defendant owed plaintiff the duty of ordinary care, that defendant was required to exercise such care for plaintiff's safety as would not amount to a violation of custom. Defendant offered two instructions which would have given the jury the question of whether plaintiff had a right to be on the truss, namely, the question of whether he was a trespasser. One of these instructions stated that if there was no agreement, contract or understanding between defendant and plaintiff's employer relative to their respective employees, then defendant owed plaintiff only the duty of care for his safety which defendant would have owed a stranger. The second instruction defined ''stranger'' as either a ''trespasser or at best a bare licensee.'' It then stated that a ''stranger'' cannot be an ''invitee.'' These instructions should have been given, as nowhere did the court give the jury the opportunity to decide whether plaintiff was a trespasser. One instruction stated that if plaintiff's employer were not to install the electrical work until after the steel had been erected defendant ''was not under any obligation to plaintiff to depart from the normal, customary and usual methods of steel erection . . .'' This, in effect, was an instruction that even if the electrical work was not to be installed until the erection of the steel work (in which event the electrical workers would have no right on the steel work) nevertheless defendant owed plaintiff the duty of not departing from the normal, customary and usual methods of steel erection. This is incorrect. █ In such event, unless defendant knew or had reason to know that plaintiff would go on the steel work, the only duty owed plaintiff by defendant would be that of refraining from causing him wilful and wanton injury. The nearest the court came to giving the jury

the chance to decide if plaintiff, under the evidence, had a right to be where he was, was in the instruction that if the defendant neither knew nor had reason to know that plaintiff would use the sag rod, defendant was under no duty to warn him not to use it. This was not sufficient to instruct that the jury must first determine that plaintiff must be more than a trespasser before any duty at all, either to install the sag rod in a rigid position or to warn, would arise. The court did not define the terms "invitee" (which the plaintiff claims he was) or "bare licensee" or "trespasser" (which defendant claims he was). There is considerable confusion in the authorities, especially in California, as to the difference in liability of an invitor to an invitee, from that of a licensor towards a licensee or an owner to a trespasser. Volume I, Witkin, Summary of California Law, Sixth Edition, defines a licensee as follows—"A licensee comes on the land by consent or permission, but usually for purposes of his own, having no relation to the business of the owner or occupant" (p. 741, § 207), and an invitee, thus—"An invitee enters at the 'express or implied invitation' of the occupant, for a purpose 'of common interest or mutual benefit' to the owner or occupant and himself, or in connection with the business of the occupant." (p. 742, § 210.) As to the duty of the licensor to the licensee— "Many California cases state that the duty is practically no greater than that owed to a trespasser; i. e., the licensee assumes the risks incident to the *condition of the premises,* and can recover only for 'wilful or wanton injury' " (p. 741, § 208; emphasis added)—but then goes on to say that "where the presence of the licensee *is or should reasonably be known,* there is a duty to carry on *activities* with reasonable care." (p. 741, § 209.) There is some attempt made in this latter event to distinguish between active and passive negligence (see p. 742). The duty owed an invitee or business visitor, says Witkin, "is to exercise *ordinary care* to keep the premises in a *reasonably safe* condition." (p. 744, § 213.) The Restatement, Torts, does not make exactly the same categories as does Witkin and the California cases. It defines a licensee (p. 893, § 330) as "a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission" and breaks down licensees into two classifications: (1) gratuitous licensee, which it defines (p. 896, § 331) as "any licensee other than a business visitor as defined in § 332" and (2) business visitor, which it

defines (p. 897, § 332) as "a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." It also defines the liability somewhat differently. It states (p. 929, § 341) : "A possessor of land is subject to liability to licensees, whether business visitors or gratuitous licensees, for bodily harm caused to them by his failure to carry on his activities with reasonable care for their safety, unless the licensees know or from facts known to them, should know of the possessor's activities and of the risk involved therein." Again it states (p. 932, § 342) : "A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he (a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and (b) invites or permits them to enter or remain upon the land, without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to warn them of the condition and the risk involved therein." There is some difference in the liabilities imposed in California as compared to those set forth in the Restatement. ▮ California refers to the duty of a licensor to a licensee merely to refrain from wilful or wanton injury, as to the *condition* of the licensor's premises. The Restatement has no such limited rule. California does require the same degree of care as the Restatement as to activities carried on by the owner where the presence of the licensee is or reasonably should be known to the licensor, namely, ordinary care. The main difference between the duty owed a licensee and that owed the person referred to in California as an invitee, and in the Restatement as a business visitor, is that in addition to using ordinary care not to harm the invitee or business visitor the landowner must use reasonable care to discover conditions which might cause such harm. Both Witkin and the Restatement agree on the definition of trespasser as one who enters or remains on land without privilege or consent and that the duty owed a trespasser by the owner is merely to refrain from wilful or wanton injury to him. However, if the landowner knows or should know that a trespasser has come on the land, he has a duty to warn him of concealed dangers and to exercise reasonable care in carrying on activities. In *Newman* v. *Fox West Coast Theatres,* 86 Cal.App.2d 428 [194 P.2d 706], the court summarized the rule as to licensees as follows (p. 431) :

"While a number of California decisions have held that the duty owed by the owner or occupant of premises to a licensee is not much greater than that owed to a trespasser, to wit, that the licensee assumes the risks incident to the condition of the premises, and can recover only for 'wilfull or wanton injury' [citing cases], in *Oettinger* v. *Stewart*, 24 Cal.2d 133, 138 [148 P.2d 19, 156 A.L.R. 1221], it was announced that such cases were disapproved, and the court held 'that in cases involving injury resulting from active conduct, as distinguished from condition of the premises, the landowner or possessor may be liable for failure to exercise ordinary care toward a licensee whose presence on the land is known or should reasonably be known to the owner or possessor. . . .' Thus where the presence of a licensee is or should be known there is a duty to carry on activities with reasonable care. In thus holding the Supreme Court revived the rule enunciated as early as 1913 in *Lucas* v. *Walker*, 22 Cal.App. 296, 301 [134 P. 374, 379], where it was decided that a licensee may recover for 'active negligence' or 'an overt act of negligence' as distinguished from a 'passive negligence.' That rule has been approved in a number of subsequent decisions [citing cases]. . . ."

One of the questions the jury should have been called upon to determine, was whether plaintiff was on the truss with the permission, express or implied, or the toleration of defendant. If he was, then the rule as set forth in *Perry* v. *D. J. & T. Sullivan, Inc.*, 219 Cal. 384 [26 P.2d 485], would apply. There, in referring to a like situation where the employee of one independent contractor was injured by the negligence of another contractor, the court said (p. 389): "There is no dispute as to the status of the employers of the respondent and the appellant Smith respectively while on the premises of the owner. Each was there under contract to perform separate and distinct work on the building, independent of each other. As to the owner, they were each invitees, and as to each other they were strangers between whom there was no privity of contract. As such contractors, they owed to the employees of each other the same duty of exercising ordinary care for their safety during the progress of the work as they owed to the public generally. (Secs. 1708, 1714 and 3281, Civ. Code; 8 Thompson on Negligence, sec. 685; *Hall* v. *Barber Door Co.*, 218 Cal. 412 [23 P.2d 279].) The duty of care in the instant case was not only to refrain from the infliction of wilful or wanton injury, but to exercise ordinary

care for the safety of the employees of the other contractor on the building.'' And as we said in *Biondini* v. *Amship Corp.*, 81 Cal.App.2d 751, 760 [185 P.2d 94] : ''A person may be an invitee as to one portion of the premises and a mere licensee or even a trespasser as to others, but the question as to the extent of the invitation is usually one for the jury and not for the court. . . . 'The question as to whether the invitation, express or implied, included that part of the premises where the injury occurred is generally not one of law. On the contrary, it is usually a question of fact for the determination of the court or jury. (Citing cases.) . . .' ''

 If a plaintiff goes beyond the scope of his invitation from the owner, and is not invited to the location by the contractor there in charge, he loses (1) his status as invitee of the owner, and (2) his *equal footing* with the other contractor. Thus, in *Scott* v. *Fuller Co.*, 41 Cal.App.2d 501 [107 P.2d 55], a judgment notwithstanding the verdict was affirmed against a plaintiff who had used a portion of the premises he had not been invited to use. Plaintiff was a painter, employed by a subcontractor, and was injured when he used as scaffolding a joist set up for the general contractor as part of a form for the purpose of pouring concrete. The suit was against the general contractor. The appellate court found no evidence of express permission and no possible inference of implied invitation, and therefore affirmed the judgment in favor of defendant: ''The most favorable inferences which may be drawn from the evidence lead to the conclusion that appellant was a mere licensee with respect to the use of the concrete forms as scaffolds. The record negatives any inference from which it could be concluded that appellant was invited to use the forms for this purpose.'' (P. 505.)

 The key question is as to plaintiff's status as against the defendant at the particular time and place of the accident. As we pointed out before, there is evidence from which a jury could find that plaintiff was an invitee of defendant or a licensee or trespasser with knowledge. However, it is not such evidence as to compel such a finding as a matter of law. Under the evidence, the jury could have found in accord with the superintendent's testimony that the electricians were not entitled to go on or use uncompleted steel work. The court should have given the instructions offered on this subject so that the jury, rather than the court, could have determined whether plaintiff was a trespasser whom defendant did not

know or have reason to know might use the truss. (See *State Compensation Ins. Fund* v. *Allen,* 104 Cal.App. 400 [285 P. 1053].)

The judgment is reversed.

Peters, P. J., and Ward, J., concurred.