W. MAURINE CAREY, as Administratrix, etc., Plaintiff and Appellant, v. SEEGER ELECTRIC COMPANY et al., Defendants and Respondents.

Conroy & Conroy and Edward L. Conroy for Plaintiff and Appellant.

Warren D. Allen, Jean Wunderlich, Spray, Gould & Bowers, Daniel O. Howard, Kinkle, Rodiger, Graf & Dewberry and William B. Rodiger for Defendants and Respondents.

ROTH, J.— ■ This action is one to recover for the alleged wrongful death of John C. Carey (hereinafter referred to as "Carey"). This appeal is by W. Maurine Carey, as Administratrix of the estate of John C. Carey, deceased, (appellant) from orders granting respective motions of respondent Seeger Electric Company, a corporation (hereinafter referred to as "Seeger"), respondent Module Wall Corporation (hereinafter referred to as "Module"), and respondent Ansaldo Brothers, a copartnership (hereinafter referred to as "Ansaldo"), for judgment notwithstanding a jury verdict in the sum of $75,659.26 in favor of appellant, and, in the alternative, granting the respective motions of each of said respondents for new trial on the ground of insufficiency of the evidence to sustain the verdict.

The accident resulting in the death of Carey occurred on May 5, 1960, on the premises of Microdot, Inc. ("Microdot"), where Carey was then and for a period of approximately eight months had been employed by Microdot as managing engineer.

For approximately one year prior to the 5th, Microdot had been engaged in making extensive improvements on its plant.

All construction work was under the supervision of Robert Seeger, an employee of Microdot in the capacity of plant and safety engineer. Robert was a brother of the president of Seeger Electric Co., one of the respondents. Different phases of the construction job were let out to various contractors some of whom included the three respondents. On the day of the fatality construction work was in progress on the second floor of the Microdot Building. There was a stairway between the first floor and the second floor, and within a few feet of the stairway there was a trapdoor. Subject to conditions hereinafter pointed out, all of the respondents and their respective employees were permitted to use this trapdoor for the purpose of hoisting materials from the first to the second floor.

The dimensions of the trapdoor were 4 by 6 feet. There was testimony that for a long time there was no door installed on the hole. At some time prior to the accident, a door was fitted over the opening. The door weighed about 200 pounds and was lifted up by an electric hoist. The door was hinged and when open was pushed back against the wall. The hoist had a monorail arrangement, so that it would slide in a north-south direction. It was used for lifting objects from the first floor through the trapdoor. The monorail was about 10 feet long and could move objects about 5 or 6 feet away from the hole.

The evidence does not disclose when the trapdoor area came into existence, but Robert Seeger testified that he constructed a barricade made of wooden 2 by 4's approximately 42 inches high for the trapdoor area right after construction started, when the second floor was being laid.

The barricade could be moved with little difficulty when materials were being hoisted through the trapdoor area, and was frequently moved to make room for the hoisted materials.

It is undisputed that Robert Seeger told all contractors and all of the employees of contractors, including respondents and their employees, that the trapdoor was to be closed at all times and to have a barricade around it, that the barricade was not to be moved except when the trapdoor was open for the purpose of bringing material up and that when the trapdoor was open for that purpose, there was to be a man at the top and a man at the bottom at all times. Also that the moment the material was up, whether the trapdoor was open or closed, the barricade was to be put back. Each of said respondents and their respective employees were also told

that if these instructions were not followed, the trapdoor would be nailed shut, and they would have to carry their materials up.

Carey was chief engineer of Microdot and had two engineers and a draftsman working under him as well as six or seven engineers who worked in another department and was the head of the research and development.

At the time of the accident, Carey was walking on the second floor and fell through the trapdoor opening. There was no barricade around the trapdoor opening and none of the employees of any of the respondents were there at the time. Carey died as the proximate result of the injuries received in the fall and left surviving him as his heirs-at-law, his wife (appellant) and three minor children.

The evidence shows without dispute that at the time of the fatality the trapdoor was up and that there was an open hole on the second floor and that the barricade described was not up nor was there anything else to protect or cover the open hole.

The evidence also shows that all of the three respondents were working near the trapdoor in the morning prior to the accident.

It is undisputed that all Microdot employees had been instructed in a variety of ways to keep out of the construction area where the trapdoor was. Robert Seeger testified that he talked about the construction to Carey on many occasions ". . . because one of his people, one of the engineers working for Mr. Carey, had a great habit of wandering through the plant. I run him out so many times, and others, that I figured the best way to do would be to talk to Mr. Carey personally and have him keep this person out of there.

"Q. You understood Mr. Carey was supervisor over this particular person?

"A. That is correct. He was chief engineer.

"Q. What was the name of this other person, this other engineer that you mentioned?

A. William Bentley."

Robert Seeger testified further that on one occasion he took Carey in to show him the trapdoor in order to point out to him the hazard of an opening such as the trapdoor when a building was under construction and told Carey that he didn't want him or any of the employees of Microdot in the construction area and that Carey agreed with him that people could be hurt.

It was shown without dispute that Microdot posted a memorandum on five bulletin boards warning all unauthorized persons to keep out of the construction zone. A copy of the warning dated November 3, 1959, was introduced in evidence and is as follows:

"To: ALL EMPLOYEES OF MICRODOT, INC.

"FROM: ROBERT S. DICKERMAN, PRESIDENT.

"As a safety precaution and until further notice, no one is to use the rear door of the plant. In getting from the parking lot to the plant, *do not go thru any construction area space— Use The Public Sidewalk.*

"We must depend upon your complete cooperation so there will be no injury to anyone during the construction of the new addition. Thank you."

In addition, loudspeaker announcements were made by an employee of Microdot from time to time, warning all employees of Microdot to stay out of the construction area.

William Bentley, a development engineer in the employ of Microdot was one of appellant's witnesses. He was the only person with Carey at the time of the accident. He testified that he last heard the announcement instructing employees to stay out of the building area several weeks before the accident, but admitted that such warnings had been given from time to time over a five or six months' period.

Bentley testified that immediately prior to the accident he and Carey went into the construction area after a coffee break. There were no workmen in the area at the time. Specifically on this point Mr. Bentley stated:

"Q. Was there a coffee break at the time this accident happened? You fellows were on your coffee break?

"A. We had just been drinking coffee and we hadn't gotten back to our desks. I don't know how you would call it.

"Q. So you just had your coffee and before you went back to work you decided to go in and see what was going on in the construction area?

"A. I suppose it was generally my fault for the whole thing. I had mentioned to John that they had put up floor-to-ceiling partitions in that area and I kidded him a little about why he only rated a five-foot partition. And that was our reason for going in there.

"Q. So you went in to look it over?

"A. Yes."

When the two men were 20 or 30 feet from the trapdoor, Bentley mentioned that he wondered why the ceiling had

been lowered right beyond the hoist trap since it would make it difficult to move the hoist back over the floor level and that he then turned away from the hoist area to go back downstairs. He stated that he thought the decedent was beside him when he was leaving the area, said something to the decedent and when he didn't hear a reply, turned around and didn't see the decedent. After a second or two, he thought of the trapdoor, ran over to it and saw decedent on the cement floor below.

Bentley testified that he could see the hole where the trapdoor was as there was nothing to obscure his vision, except that the hole blended into the floor.

Specifically Bentley said:

"Q. You could see the hole there at that time?

"A. Yes.

"Q. Was there anything to obscure your vision of the trapdoor?

"A. No, except that I probably saw it blended into the floor without any railing or anything else.

"Q. Well, the trapdoor was open, was it not?

"A. Yes.

"Q. That meant it was hinged and pushed against the—

"A. It was hinged and pushed back against the wall, but it was about the same color—unless you would observe it, you really wouldn't notice that the trapdoor was open, I don't think, unless you knew it was there.

"Q. Are you saying that the hole was the same color as the floor?

"A. From that distance away, unless you were looking for it, I don't think you'd notice it.

"Q. How big was this hole?

"A. Oh, it was about six by eight, or something."

Bentley further testified that he and a group of five or six would wander through the construction area once or twice a day and talk with the construction men, that Carey did not join them on those walks and that he had never heard Robert Seeger tell Carey to stay out of that area. He stated that when he and the other employees would go into and look over the construction area, usually the supervisor on the job would greet them and that they were only asked to leave once on an occasion when steel beams were being hauled into the area. Bentley added that in the last few weeks prior to the accident, construction had been finished on the lower floor, and the employees of Microdot from the inspection and ship-

ping department would come up the stairs, walk through the construction area and that he never observed anyone telling them not to do so.

It appears from the testimony herein summarized and inferences which can be properly drawn therefrom that:

1. Carey and all Microdot employees knew or should have known that the trapdoor opening was dangerous and that visiting in the construction area was forbidden.

2. All of the respondents and their employees were on notice that the trapdoor was a dangerous hazard.

3. Respondents and their employees had specific instructions in respect of the use of the trapdoor opening and the manner in which the opening must be protected.

4. Respondents and their employees knew of the repeated warnings and notices to the Microdot employees.

5. At the time of the accident, the trapdoor was hinged and pushed up against the wall, that it was the same color as the floor and that it was difficult to notice that the trapdoor was open and there was no barricade protecting the trapdoor opening.

6. Respondents and their employees knew or should have known that Microdot employees, in spite of instructions which they had received not to walk in any of the construction areas, were continuously and habitually walking around, about and through the places of construction.

7. Respondents and their employees encouraged violations by Microdot employees of instructions not to walk in the construction areas by greeting employees instead of warning them off.

8. Carey was not an ordinary employee. He was an executive of Microdot and when walking with Bentley in the construction area immediately prior to the accident, it could be assumed that Carey, failing to see that the barricade was up, walked to where the trapdoor was located to make sure that the trapdoor was down and that because the hinged trapdoor against the wall, the hole in the floor left by the lifted trapdoor, and the floor all blended together, came upon the open hole before he actually saw it.

During the trial of the action motions for nonsuit were made by the respective respondents. The court said in respect of said motions:

" ... There is definite proof so far as your side of the case is concerned [appellant's] that the hole was unattended and unbarricaded. So start from that premise with the argument.

I go along with you at that point. You don't need to use any authority as to that at all. That is established by the evidence that there was a negligent omission on somebody's part to protect the hole."

Later the court said:

"THE COURT: Mr. Conroy, you are arguing with yourself because I started out by telling you that I concede all of these things. Talk about the *Jim Ruby* case."

The case to which the trial court referred is *Allen* v. *Jim Ruby Construction Co.*, 138 Cal.App.2d 428 [291 P.2d 991] (hearing denied by the Supreme Court). It was heavily relied on by respondents in the trial court and is heavily relied on in this court.

It is clear from the record that the court granted the motions of respondents for judgments notwithstanding the verdicts, not because the court did not believe there was negligence, but because the court was convinced that under the law as set out in the *Jim Ruby* case Carey was a trespasser or licensee and therefore obligations which respondents might owe to Carey, if he were an invitee rather than a trespasser or licensee, had no application.

It is our feeling that the *Ruby* case on the facts is distinguishable from the case at bar and that the orders for judgments notwithstanding the verdict were not warranted.

The jury was instructed on the subject of negligence, proximate cause and on contributory negligence. By its verdict it obviously came to the conclusion that respondents were negligent and that said negligence was the proximate cause of the death.

The jury came to the conclusion that Carey was not guilty of contributory negligence even though the evidence shows without contradiction that the trapdoor was open, and it was obvious that Carey knew or must have known that there was this trapdoor. Whether the jury came to its conclusions because of the presumption of due care, the doctrine of momentary forgetfulness, which gives it the right in proper circumstances to exonerate one from contributory negligence, or because it concluded that Carey despite his knowledge of the trapdoor, and actually because he knew it was a hazard when left open and unguarded, and despite his instructions not to walk in the construction area, did, as an executive employee of Microdot, walk over to put the barricade up and was deceived as to the exact location of the open hole by the light, or he could have momentarily forgotten just where the hole

was. It has been held that momentary forgetfulness may be in accord with the conduct of a reasonably prudent man. (*Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 234 [282 P.2d 69].)

The jury obviously resolved the question of contributory negligence in favor of Carey and it cannot be said that there is no substantial evidence in the record to support the findings in Carey's favor which are implicit in the jury's verdict.

It is clear therefore, that if the doctrine of the *Jim Ruby* case does not apply, that the orders of the court granting the respective motions of respondents for judgment in their favor notwithstanding the verdict, are erroneous.

The question then is the same one that appears to have been decisive with the trial court. Was Carey a trespasser, a licensee or an invitee? Does it make any difference?

In the *Ruby* case the facts were as follows:

"There was evidence of the following facts: In the course of the work in which defendant was engaged it was necessary to make an excavation which involved a breaking up of concrete, the cutting off and removal of steel rods and the removal of all material necessary in the excavation of a pit. . . . In this work the concrete was broken up, rods were cut, and the material was thrown out of the pit by hand onto the ground where it was picked up by hand and thrown into trucks to be hauled away. . . . Plaintiff was working on the northerly side of the pit about 10 feet distant therefrom when he decided to walk past the pit on the north side to a washroom. As he proceeded he stumbled on a steel bar or rod 3 or 4 feet long, which was lying on the ground 4 or 5 feet north of the pit and about midway between the easterly and westerly ends of the pit. His foot struck the bar; he lost his balance and went forward into the pit. There was no barrier around the pit. No witness observed plaintiff's fall into the pit. . . ." (*Supra*, p. 429.)

In the *Ruby* case as in this case the plaintiff was an employee of the owner of the land upon which the pit was being constructed and had been warned not to go upon the portion of the premises where the pit was being constructed.

The Court in the *Ruby* case then stated at pages 432-433:

"It could be argued with considerable force that plaintiff was not even a licensee in that it was not shown that he had either express or implied permission to walk around the edges of the pit. In view of the nature of the work that had been going on, and would continue until the pit was com-

pleted, it would be a reasonable assumption that Ruby would have preferred that strangers to the work would remain away from the pit and the area around it which he was using for deposit of the excavated material. But inasmuch as plaintiff was not a business invitee it is immaterial whether the facts would have justified a conclusion that he was a licensee of Ruby and not merely a trespasser.

" . . . . . . . . . . . .

"If we assume, without so deciding, that plaintiff was a licensee complaining of an unsafe condition of the premises the applicable rule is the one stated in *Fisher* v. *General Petroleum Corp*, 123 Cal.App.2d 770, 777, 778 [267 P.2d 841] [Citation] ' " . . . where a person goes upon the premises of another without invitation and simply as a bare licensee, and the owner of the property passively acquiesces in his coming, if an injury is sustained by reason of a mere defect in the premises, the owner is not liable for negligence for such person has taken all the risk upon himself.' ' (See also *Koppleman* v. *Ambassador Hotel Co.*, 35 Cal.App.2d 537, 540 [96 P.2d 196]; *Oettinger* v. *Stewart*, 24 Cal.2d 133, 139 [148 P.2d 19, 156 A.L.R. 1221]; *Saba* v. *Jacobs*, 130 Cal.App.2d 717 [279 P.2d 826]; *Palmquist* v. *Mercer*, 43 Cal.2d 92 [272 P.2d 26].)''

In *Ruby* the only construction work was the pit, the dimensions of which were 33 by 11 and it was huge compared with the trapdoor opening.

 In the case at bar, the trapdoor opening was an incident of much construction work that had been going on for a period of over a year and was in the process of completion. The trapdoor opening actually came into being months after the construction had started and months after Microdot had warned its employees to stay out of the construction area. The written warning heretofore referred to actually had no relevance to the trapdoor on the second floor at the time it was issued.

In addition, respondents had assumed a positive obligation to barricade the space around the trapdoor and to permit it to remain open only when it was in use, and when in use, to have one man at the top and one man at the bottom.

On the evidence as recited certainly for the purposes of a judgment notwithstanding the verdict, the conduct of respondents was such as to make invitees of Microdot employees despite Microdot's instructions. Bentley's testimony in respect of the hospitality of respondents and their respective

employees is uncontradicted. The undisputed evidence is such that whether Microdot employees were invitees, licensees or trespassers, the respondents had continuous notice that Microdot employees were, whether spurred by idle curiosity or otherwise, taking walks into the construction area.

Wholly aside from the question of whether Carey was an invitee, there is respectable authority holding that the degree of care required from one to another will be determined by the factual circumstances in each case. (*Chance* v. *Lawry's, Inc.*, 58 Cal.2d 368 [24 Cal.Rptr. 209, 374 P.2d 185]; *Fernandez* v. *Consolidated Fisheries, Inc.*, 98 Cal.App.2d 91 [219 P.2d 73].) In *Chance* v. *Lawry's, Inc., supra,* the court said (pp. 376-377): "It is clear that, where an independent contractor exercises control over the owner's premises, his duty of care toward third persons is commensurate with that of the owner. ... The exact duty of care imposed on an independent contractor varies with the seemingly endless combinations of relationships possible and cannot be defined by any general formula.

"The imposition of a legal duty by precisely defining the status of the injured person *vis-à-vis* the tortfeasor is hard enough and often arbitrary where the defendant is an owner or occupier of real property (*Fernandez* v. *Consolidated Fisheries, Inc.*, 98 Cal.App.2d 91, 96 [219 P.2d 73]; *Hession* v. *City & County of San Francisco,* 122 Cal.App.2d 592, 602 [265 P.2d 542]; *Miller* v. *Desilu Productions, Inc.,* 204 Cal. App.2d 160 [22 Cal.Rptr. 36]; Hughes, *Duties to Trespassers: A Comparative Survey and Revaluation* (1959) 68 Yale L.J. 633). But where the defendant is not an owner or occupier the application of these legal distinctions becomes impossible in fact and is without reason. These limitations on the duty of care of the owner or occupier 'originated in an overzealous desire to safeguard the right of ownership and it was regarded under a system of landed estates. . . .' (2 Harper & James, Torts (1956) § 27.2, p. 1434.) For that reason it can be forcefully argued that this immunity should not be extended to others. (2 Harper & James, Torts (1956) § 27.2, p. 1434; Fleming, Torts (1957) p. 431; Marsh, *The History and Comparative Law of Invitees, Licensees and Trespassers* (1953) 69 L.Q. Rev. 182, 359; *Langazo* v. *San Joaquin, L. & P. Corp.,* 32 Cal.App.2d 678, 687-690 [90 P.2d 825]; *Humphrey* v. *Twin State Gas & Electric Co.,* 100 Vt. 414 [139 A. 440, 442, 56 A.L.R. 1011].) Justice will not be served by trying to fit each case involving an independent contractor into a Procrustean

bed bounded by the concepts of 'invitee' at the head and 'licensee' at the foot.

■ "The liability of an independent contractor to one not a party to his contract 'is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the policy of preventing future harm.' . . .''

In *Fernandez* the court said commencing at page 95: "The law in reference to the duty owed to trespassers, licensees and invitees has largely developed in reference to the duty of an owner or occupier of real property or structures thereon. The statutes of this state do not provide that a different duty is owed to persons in the three named categories. The only relevant statute is section 1714 of the Civil Code, which provides: 'Everyone is responsible, not only for the result of his wilful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has wilfully or by want of ordinary care, brought the injury upon himself.' In spite of this code section, which has been in our law unchanged since 1872, and which states a civil law and not a common-law principle (Code Napoleon, § 1383; Louisiana Code (1808) § 2215), our courts, in some cases at least, and in apparent disregard of the section, have followed the common-law rule, which purports to make precise and rigid distinctions as to the duty owed by the owner or occupier to invitees, licensees and trespassers. Thus, it has been stated that towards a trespasser the owner or occupier only owes a duty to refrain from wilful or wanton conduct; towards a licensee a similar duty, plus the affirmative duty to warn of unusual dangers, while towards an invitee there is the duty to exercise ordinary care and prudence. (See cases collected 13 Cal.L.Rev. 72, 73; footnotes 5, 6 and 7.) Such an approach requires a court to first determine the precise status of the visitor, which is sometimes a most difficult task, and then to determine from the cases whether the owner has violated any duty owed to a member of such a class. Such an approach is unrealistic, arbitrary, and inelastic. The point where the duties towards members of each of the classes begins or ends, or where it should begin or end, or where the duty not to act becomes supplemented by the duty to act, is almost impossi-

ble of perception. It is no wonder that exceedingly fine distinctions have been developed so that the law is most confused in this field. (See, note, 13 Cal.L.Rev. 72.) Many cases, and particularly the more recent ones, have in fact applied the general doctrine of negligence embodied in section 1714 of the Civil Code rather than the common-law rigid categories test. (For a good discussion of these problems see *Boucher v. American Bridge Co.*, 95 Cal.App.2d 659, 667 et seq. [213 P.2d 537].)''

█ Since the rule which must govern the court on a motion notwithstanding the verdict is the same as that on nonsuit, i.e. all evidence, and presumptions and inferences therefrom must be resolved in favor of plaintiff, we feel it was erroneous to grant motions for judgment notwithstanding the verdict.

The judgments and each of them for respondents are reversed.

█ We cannot say however that the trial court from its front seat objective review of the record abused its discretion in granting a new trial. The orders granting to each of respondents a new trial, and each of them, are hereby affirmed.

Herndon, Acting P. J., and Kincaid, J. pro tem.,* concurred.

The petitions for a rehearing were denied April 2, 1964, and respondents' petitions for a hearing by the Supreme Court were denied May 6, 1964.

---

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.